[No. 16160-9-III. Division Three. April 6, 1999.]
THE STATE OF WASHINGTON, *Appellant*, v. MICHELLE REANE
CORN, *Respondent*.

*Andrew K. Miller, Prosecuting Attorney*, for appellant.
*Lenell Nussbaum*, for respondent.

Kurtz, A.C.J. — Michelle Corn was charged with first and second degree manslaughter for the stabbing death of her boyfriend, Darin Haney. After the jury began deliberations, the prosecutor discovered that an erroneous instruction related to the law of self-defense had been given to the jury. The trial court conferred with counsel for both parties and submitted a corrected jury instruction. After the jury found Ms. Corn guilty of first degree manslaughter, the trial court granted Ms. Corn's motion for a mistrial. On appeal, the State challenges the court's decision to grant a new trial contending any error was cured by the corrected jury instruction. The State further contends Ms. Corn waived her right to object to the instruction by failing to object when the erroneous instruction was given and by failing to

object to the court's decision to submit the corrected instruction to the jury. Ms. Corn cross-appeals challenging the decision of the trial court to admit the statements she made to police after her arrest. Ms. Corn contends her written statement should be suppressed because she was denied due process and her right to counsel when the police denied her access to her attorney.

We conclude the original self-defense instruction created an error of constitutional magnitude and the trial court did not abuse its discretion by granting a new trial. Furthermore, based upon *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), and *State v. Earls*, 116 Wn.2d 364, 805 P.2d 211 (1991), we conclude the statement Ms. Corn made to the police after her arrest is admissible.

## FACTS

On November 21, 1995, in response to a 911 call, two Kennewick police officers entered the apartment of Michelle Corn and discovered a man lying on the floor. Ms. Corn was on her knees next to him holding a phone receiver that was covered with blood. Ms. Corn asked the officers to "Please help him." The man, Darin Haney, was transported to the hospital by paramedics. He died later that evening of a single knife wound to the heart.

Ms. Corn was taken into police custody. Before she was advised of her *Miranda*[1] rights and interrogated, she made statements concerning the fatal incident to the police officers that were assigned to hold, but not interrogate, her. Detective Kenneth Taylor, who was assigned to interrogate Ms. Corn, advised her of her *Miranda* rights at 12:01 A.M. and again at 12:52 A.M. Both times Ms. Corn waived her rights. Ms. Corn signed a written statement at approximately 2:30 A.M. Twice during her interrogation, Ms. Corn asked Detective Taylor for information concerning the

---

[1]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

condition of Mr. Haney. On both occasions, Detective Taylor informed Ms. Corn that Mr. Haney's condition was grave. At the time of the second inquiry, Detective Taylor knew Mr. Haney was dead, but decided to withhold this information from Ms. Corn.

After Ms. Corn was taken into custody, her family retained an attorney to represent her. The attorney called the police department and informed them that: (1) he had been retained by Ms. Corn's brother; (2) he wanted to talk to Ms. Corn; and (3) he wanted all interrogations to stop. In response, the attorney was told he would not be able to see his client because Ms. Corn had not requested counsel. He then called Andy Miller, the prosecuting attorney, at home and reiterated his demand to see his client. Mr. Miller advised him the police could prevent him from seeing his client unless she requested counsel.

When the attorney arrived at the police station, he was informed that Ms. Corn was at the hospital. He stated that he wanted to see her as soon as she returned to the station, and that he did not want her talking to police officers. When Ms. Corn returned from the hospital, the police did not inform her of the presence of the attorney. The police did not tell the attorney that Ms. Corn was at the station until the interrogation had been completed. The police also delayed informing Ms. Corn of Mr. Haney's death until after the interrogation was completed and her written statement was signed.

Ms. Corn was initially charged with manslaughter in the second degree, but later the charge was amended to manslaughter in the first degree. Prior to trial, the court concluded that Ms. Corn's statements to the police officers, including the written statement, were admissible for purposes of CrR 3.5. The court concluded that Ms. Corn knowingly, voluntarily and intelligently waived her rights. The court also concluded these statements were voluntarily made and the police had no duty to inform Ms. Corn of the attorney's attempts to contact her because Ms. Corn's brother, and not Ms. Corn, had retained the attorney. The

court also concluded that while Ms. Corn had been misled during the interview about Mr. Haney's condition, she was aware that he was in "grave condition" and that she faced "potential serious legal consequences."

Ms. Corn testified at trial that she began dating Mr. Haney in March 1995. By late April, Mr. Haney was regularly spending the night at Ms. Corn's apartment. Ms. Corn and others testified that the relationship between Mr. Haney and Ms. Corn included violence. According to Ms. Corn, on November 21, 1995, Mr. Haney stopped by the Village Tavern, where she worked. After her shift was over, Ms. Corn and Mr. Haney stayed at the tavern and drank beer with two friends. When Mr. Haney tried to get in a fight with another patron, Ms. Corn persuaded him to leave.

According to Ms. Corn, Mr. Haney then drove them over to a restaurant. As they entered the parking lot, the car Mr. Haney was driving struck a car that was trying to leave. After the accident, Mr. Haney and Ms. Corn argued about his driving without a license or insurance. Ms. Corn told him to stop the car. She got out and walked back to the apartment. Once there, Ms. Corn realized she did not have her key. Mr. Haney drove up. She asked him for the key. He unlocked the door and entered the apartment where they continued their argument. Ms. Corn then told him to leave or she would leave. Mr. Haney left, slamming the door behind him.

Ms. Corn began tidying up the apartment. As she was putting silverware from the drying rack into the drawer, she felt someone shove her from behind and say, "Fuck you!" Ms. Corn was terrified and jumped "about 20 feet." She stated, "he scared me almost out of my skin." It was Mr. Haney, although his voice sounded strange, lower than usual. Mr. Haney continued the argument about the car accident. Ms. Corn had three knives in her hand from the drying rack. She again told him to leave or she would. She began walking from the kitchen toward the door. Mr. Haney, ahead of her, turned as if he were leaving. But then

he turned around and began yelling. He grabbed her arms and started shaking her. The knives fell to the floor.

According to Ms. Corn, Mr. Haney grabbed her by the hair, pulling her head back until she was forced to the floor. Then he straddled her and began to choke her. All Ms. Corn could think of was the memory of not being able to breathe when he had choked her on an earlier occasion. Ms. Corn got a foot underneath her and managed to push Mr. Haney backward off of her. She grabbed one of the knives, stood up, and said, "Leave." As Ms. Corn stepped toward Mr. Haney, he rushed at her. Mr. Haney fell back against the wall, then fell forward into Ms. Corn's arms. She caught him and held him up, thinking he was joking. She then lowered him to the floor. Realizing he was hurt, she called 911.

The jury was instructed on manslaughter in the first and second degree. The court also instructed on the defense theories of self-defense and accident. The following instructions were given:

### Instruction No. 18

It is a defense to a charge of manslaughter in the first and second degree that the homicide was justifiable as defined in this instruction.

Homicide is justifiable when committed in the lawful defense of the slayer when:

(1) the slayer reasonably believed that the person slain intended to commit a felony or to inflict death or *great personal injury*;

(2) the defendant reasonably believed that there was imminent danger of such harm being accomplished; and

(3) the slayer employed such force and means as a reasonably prudent person would use under the same or similar conditions as they reasonably appeared to the slayer, taking into consideration all the facts and circumstances as they appeared to her, at the time of and prior to the incident.

The State has the burden of proving beyond a reasonable

doubt that the homicide was not justifiable. If you find that the State has not proved the absence of this defense beyond a reasonable doubt, it will be your duty to return a verdict of not guilty.

### Instruction No. 19

A person is entitled to act on appearances in defending herself, if that person believes in good faith and on reasonable grounds that she is in actual danger of *great bodily harm*, although it afterwards might develop that the person was mistaken as to the extent of the danger.

Actual danger is not necessary for a homicide to be justifiable.

(Emphasis added.)

Although most of the court's instructions were proposed by the defense, the court also gave instructions 20 and 21, which were proposed by the State:

### Instruction No. 20

*Great bodily harm* means bodily injury that creates a probability of death, or which causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ.

### Instruction No. 21

Necessary means that no reasonably effective alternative to the use of force appeared to exist and that the amount of force used was reasonable to effect the lawful purpose intended, under the circumstances as they reasonably appeared to the actor at the time.

(Emphasis added.) Neither party took exception to any instructions.

In his closing, the prosecutor relied on the language of instruction number 20, combined with instruction number 18. He argued a defense was available in one of only two circumstances:

Darin Haney was going to kill her or [ ] he was going to *permanently very seriously injure* her. If she reasonably believed that, then she's entitled to self-defense. If she didn't, then she's not entitled to a self defense.

(Emphasis added.) He emphasized the instruction that the defendant was "about to be killed or about to be *permanently seriously injured.*" (Emphasis added.) He claimed a defense was available only if "she was facing death or *great, permanent, physical injury.*" (Emphasis added.)

Jury deliberations began at approximately 4:00 P.M. on August 1, 1996. Shortly thereafter, the jury requested additional copies of the instructions. The bailiff delivered five more copies. Shortly before noon the next day, the jury had an inquiry regarding instruction number 21. The court consulted with counsel and provided a response:

Question:

Instruction 21 provides a definition for the word "necessary." There is no reference to the word "necessary" in any of the other instructions that would be germain [sic] to the definition.

To what other instruction does the definition of "necessary" refer?

[Response:] Disregard instruction 21 entirely, it does not apply to this case.

About this same time, counsel for the State reconsidered instruction number 20 and concluded it was incorrect. The court and counsel met and conferred into the lunch hour about this problem. Ms. Corn was not present and had not been notified.

After lunch, the jury sent out another inquiry:

Question: with regard to Instruction #25

Is assault considered a felony?

Or does it depend on the degree of assault.

I [sic] only refers to assault as an act with unlawful force with the intent to inflict or create apprehension etc.

[Response:] Please reread instructions.

The court noted on the record that it had provided the jury with a "substituted" instruction number 20, and the response to the second inquiry. The new "Instruction No. 20" read:

> In determining whether a homicide was justifiable, the phrase, "great personal injury" means an injury that the slayer reasonably believed, in light of all the facts and circumstances known at the time, would produce severe pain and suffering if it were inflicted upon either the slayer or another person.
>
> Instruction 20 was erroneously given. You must disregard it. This instruction replaces instruction 20.

The bailiff provided this instruction to the jury.

Defense counsel noted he had had no opportunity to consult with his client about the erroneous instructions and the planned remedy. He also stated that he might later consult his client and determine if it was appropriate to ask for a mistrial. The court noted that they had proceeded without the presence of the defendant and that the court and both counsel felt it was urgent to make the substitution as soon as possible. The court requested that defense counsel consult with Ms. Corn as soon as possible. Later that day, defense counsel moved for a mistrial based on the erroneous jury instruction. The court reserved ruling. The defense later renewed the motion for mistrial. The court again reserved ruling.

After the jury announced it had a verdict, the defense again renewed its motion for mistrial. The court reserved ruling. The jury returned a verdict of guilty of manslaughter in the first degree. After a subsequent hearing on the motion for a mistrial, the court granted a new trial.

## ANALYSIS

Did the trial court err in granting a new trial based on

its conclusion that jury instruction number 20 was improper? The State contends Ms. Corn's failure to object to jury instruction number 20 at the time it was given constituted a waiver of any later objection to this instruction. The State also argues that the language of instruction number 20 was not an impermissible comment on the evidence and that, when read with the other instructions, instruction number 20 did not interject an impermissible objective standard into the instructions relating to the law of self-defense. In addition, the State asserts that any error was cured by the court's submission of the corrected instruction and that Ms. Corn's agreement with the corrected instruction precluded her subsequent request for a mistrial.

A trial judge has the discretion to give further instructions to the jury after deliberations have started. CrR 6.15(f)(1); *State v. Ng*, 110 Wn.2d 32, 42, 750 P.2d 632 (1988). A trial court's decision to grant a new trial is reviewed for an abuse of discretion. *State v. Copeland*, 130 Wn.2d 244, 294, 922 P.2d 1304 (1996).

A defendant is entitled to a jury instruction on self-defense once some evidence demonstrating self-defense has been produced. *State v. Walden*, 131 Wn.2d 469, 473, 932 P.2d 1237 (1997). Once such evidence is produced, the burden shifts to the prosecution to prove the absence of self-defense beyond a reasonable doubt. *Id.* A jury may find self-defense on the basis of the defendant's subjective, reasonable belief of imminent harm from the victim. *State v. LeFaber*, 128 Wn.2d 896, 899, 913 P.2d 369 (1996). This requires the jury to perform a subjective evaluation in that the jury must "stand in the shoes of the defendant and consider all the facts and circumstances known to him or her." *Walden*, 131 Wn.2d at 474. The jury must also perform an objective analysis in that it must evaluate the information available to the defendant to determine what "a reasonably prudent person similarly situated would have done." *Id.*

Jury instructions must more than adequately

convey the law of self-defense. *LeFaber*, 128 Wn.2d at 900. Read as a whole, the jury instructions must make the relevant legal standard manifestly apparent to the average juror. *Id.* "A jury instruction misstating the law of self-defense amounts to an error of constitutional magnitude and is presumed prejudicial." *Id. Walden* and *State v. Painter*, 27 Wn. App. 708, 620 P.2d 1001 (1980), *review denied*, 95 Wn.2d 1008 (1981), establish that instruction number 20 was erroneous for two reasons. First, this instruction misstated the subjective nature of the self-defense analysis, and second, in giving this instruction the judge made a comment on the evidence in violation of article IV, section 16 of the Washington Constitution.

In *Walden*, the defendant was charged with second degree assault for pulling a knife on three teenagers after he fell or was pushed off his bicycle. The *Walden* court concluded that the first paragraph of instruction number 18 adequately conveyed the relevant law on self-defense, but the court reversed the conviction based on its conclusion that the definition of the term "great bodily injury" used in the second paragraph of the instruction misstated the law and failed to adequately inform the jurors of the subjective standard of self-defense. The second paragraph stated: "Great bodily injury as used in this instruction means injury of a graver and more serious nature than an ordinary battery with a fist or pounding with the hand; it is an injury of such nature as to produce severe pain, suffering and injury." *Walden*, 131 Wn.2d at 472. The court concluded that by defining the term "great bodily injury" to exclude ordinary batteries, the instruction could be read to prohibit consideration of the defendant's subjective impressions of all the facts and circumstances. *Id.* at 477. The court concluded that 11 Washington Pattern Jury Instructions: Criminal (WPIC) 2.04.01 was the proper instruction to use in defining great personal injury in jury instructions on the reasonable use of force in self-defense. *Id.* at 478.

In reaching its decision, the *Walden* court relied heavily on *Painter*. In *Painter*, the defendant, who suffered from physical problems, shot and killed her unarmed stepson,

whose previous threats had caused the defendant to hire a bodyguard. A jury found the defendant guilty of first degree murder. The court reversed the conviction based on the definition of "great bodily harm" contained in instruction number 15. This instruction read: " 'Great bodily harm' means an injury of a more serious nature than an ordinary striking with the hands or fists. It must be an injury of such nature as to produce severe pain and suffering." *Painter,* 27 Wn. App. at 711. While the court noted that the general self-defense instruction, instruction number 14, was consistent with the subjective test, the effect of the definition contained in instruction number 15 completely undermined the court's statement of the law in instruction number 14. In short, instruction number 15 did not accurately convey to the jury the subjective standard employed in evaluating self-defense. In addition, the *Painter* court went further and concluded that the court's definition of great bodily harm constituted a comment on the evidence by indicating to the jury that the evidence presented at trial was insufficient to support the theory of self-defense. *Id.* at 713-14.

*Painter* and *Walden* establish that the original instruction, instruction 20, given by the court was erroneous. As a misstatement of the law, it is presumed prejudicial to Ms. Corn. Ms. Corn was therefore entitled to a new trial unless the error was found to be harmless beyond a reasonable doubt. *Walden,* 131 Wn.2d at 478. Here, in granting a new trial, the trial court found it "cannot conclude that the original instruction did not effect [sic] the verdict." The trial court did not abuse its discretion in reaching this conclusion.

■ The State first argues that Ms. Corn's failure to object to the initial instruction constituted a waiver of any later objection. In *Painter,* the defendant had also failed to object to the instruction at trial. Concluding that the erroneous instruction went to the essence of the defendant's defense, the *Painter* court determined that the defendant had been deprived of due process and that the waiver theory was inapplicable.

The State attempts to distinguish *Painter* on two grounds. First, the State contends the *Painter* court based its decision concerning the waiver argument on its finding that the incorrect instruction was a comment on the evidence. While the instruction in question does not refer to a specific cause of the injury, the instruction does refer to injury that "creates a probability of death," "causes significant serious permanent disfigurement" or a "significant permanent loss or impairment," none of which was established here. By giving this instruction, the trial court here left the impression that the evidence was insufficient to establish self-defense in that Ms. Corn was not faced with this type of injury.

Second, the State argues that the instructions here are different than those in *Painter* and that a reading of all of the instructions adequately informed the jury of the applicable law. Both *Walden* and *Painter* establish that an instruction containing an incorrect definition of great bodily harm is prejudicial error even when the remaining instructions correctly state the law related to self-defense.[2]

The State next argues that the error in instruction number 20 was cured by the court's submission of the correct instruction during the jury deliberation process. Contrary to the position urged by the State, the rule is not that a curative instruction at any time corrects all errors. The court examines the facts of each case to determine the prejudice to the defendant and the likelihood that the curative instruction corrected the error in a timely fashion. The record reveals that the trial court performed a careful and correct analysis in reaching its decision. The trial court did not abuse its discretion in attempting to correct the instruc-

---

[2]Our conclusion here is not changed by the recent decisions in *State v. Walker*, 136 Wn.2d 767, 966 P.2d 883 (1998), and *State v. Hutchinson*, 135 Wn.2d 863, 959 P.2d 1061 (1998), *cert. denied*, 525 U.S. 1157, 119 S. Ct. 1065, 143 L. Ed. 2d 69 (1999). The *Walker* court relied on both *Walden* and *Painter*, but concluded the trial court properly refused to give any instruction on self-defense where the evidence, taking into account all the defendant knew at the time, did not support a finding that a reasonable person would have feared great bodily harm. Similarly, the jury instructions before the *Hutchinson* court did not include the term "great bodily harm" or the questions raised by the submission of instruction number 20 here.

tion, and then granting a new trial based on its conclusion that the erroneous instruction may have affected the verdict despite the attempt to reinstruct the jury.

The State also argues that Ms. Corn's acquiescence to the judge's decision to reinstruct the jury prevents Ms. Corn from raising an objection later. In making this argument, the State is blurring the lines between the invited error doctrine and the waiver theory. While it is true that invited manifest constitutional error cannot be raised for the first time on appeal, failing to except to an instruction does not constitute invited error. *State v. McLoyd*, 87 Wn. App. 66, 70, 939 P.2d 1255 (1997), *review granted sub nom. State v. Studd*, 134 Wn.2d 1010 (1998). The record here reveals that Ms. Corn's trial counsel did not propose the incorrect instruction. When presented with the court's decision to reinstruct the jury, Ms. Corn's trial counsel indicated that he felt "it is in the best interest of my client to put in the substitute instructions rather than ask for a mistrial at this time." More importantly, trial counsel also indicated that he reserved the right to object later, after he had the opportunity to talk to his client. He stated: "I'm going to talk to her about it, and depending upon what kind of a reaction we get now as far as the length of time the jury might further go on in connection with these things, it—my client may instruct me to or I may feel it appropriate to ask for mistrial because of these two instructions[.]" The doctrine of invited error is not applicable, and by these statements trial counsel put the trial court on notice of the problems with the reinstruction procedure.

The original instruction created an error of constitutional magnitude. The trial court did not abuse its discretion by granting a new trial.

Although we are affirming the trial court's decision to grant a new trial, we will address the issues raised by Ms. Corn's cross-appeal in the belief this will assist the trial court.

Did the trial court err in admitting Ms. Corn's statement into evidence? Ms. Corn contends her statement

should have been suppressed because she was denied her right to counsel and due process by police tactics that denied her access to her attorney.[3] More specifically, she contends she was unable to make a valid waiver of her right to an attorney because the State interfered with her access to an attorney while the interrogation was taking place. She acknowledges *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), and *State v. Earls*, 116 Wn.2d 364, 805 P.2d 211 (1991), hold that a valid waiver of *Miranda* rights is not vitiated merely because the police did not inform her of the efforts of an unretained attorney to contact her while she was in custody. However, Ms. Corn points out that in both *Earls* and *Burbine* there was no evidence of police misconduct. Recognizing that the *Earls* decision was based on the conclusion that the Fifth Amendment and article I, section 22 (amendment 10) of the Washington State Constitution granted coextensive rights, Ms. Corn asks this court to conduct a *Gunwall*[4] analysis and reach a different result based on a broad reading of the due process clause of the Washington Constitution. She further contends the statement must be suppressed because it was obtained in violation of CrR 3.1.

 The law presumes that the statements a suspect makes while in custody were compelled in violation of the Fifth Amendment privilege against self-incrimination. *Miranda*, 384 U.S. at 457-58. Custodial interrogation must be preceded by advice to the accused that they have the right to remain silent and the right to the presence of an attorney. *Id.* at 479. The accused may waive the rights conveyed in *Miranda* warnings provided the waiver is made voluntarily, knowingly and intelligently. *Id.* at 444. When considering the validity of a waiver, two determinations must be made. *Burbine*, 475 U.S. at 421. First, the relinquishment of the right must be voluntary in that "it was

---

[3]Although Ms. Corn makes reference to deceptive statements made to her by the police, her argument on appeal is limited to those police tactics that denied her access to her attorney.

[4]*State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4TH 517 (1986).

the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id.* Second, the waiver must be made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.*

▮ The court must examine the "totality of the circumstances surrounding the interrogation" when making the determinations concerning the uncoerced nature of the choice and the level of comprehension of the right being relinquished. *Id.* Where custodial interrogation takes place in the absence of an attorney, the State has the heavy burden of establishing the defendant's waiver of the privilege against self-incrimination and the right to counsel. *Miranda*, 384 U.S. at 475. The burden is met if the State can prove the voluntariness of the statement by a preponderance of the evidence. *Earls*, 116 Wn.2d at 379.

In *Burbine*, Mr. Burbine, who had been arrested for breaking and entering, was questioned for a murder that had happened several months earlier. A series of interviews was conducted concerning the murder. On three separate occasions, Mr. Burbine was informed of his *Miranda* rights and signed a written form indicating that he understood his rights and that he did not want an attorney. He also signed three statements admitting the murder. Prior to the interviews, and without Mr. Burbine's knowledge, his sister had telephoned the public defender's office and asked to speak with the attorney who had been scheduled to meet with her brother concerning a third and unrelated charge. When efforts to reach that attorney proved unsuccessful, another public defender called the police station and conveyed the information that Mr. Burbine was represented by counsel who was unavailable, but that she would act as counsel should the police place Mr. Burbine in a lineup or question him. The public defender was told that the police would not be questioning Mr. Burbine or placing him in a lineup.

The *Burbine* Court considered whether Mr. Burbine's confession, which was preceded by an otherwise valid

waiver, must be suppressed because of the misinformation given to the attorney or the failure of the police to inform Mr. Burbine of the attorney's efforts to reach him. *Burbine*, 475 U.S. at 418-19. In reaching its decision, the Court rejected Mr. Burbine's argument that the failure of the police to inform him of the attorney's telephone call deprived him of information critical to his ability to make a knowing waiver of his Fifth Amendment rights. The Court concluded that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Id.* at 422. In short, the fact that an attorney is trying to contact a suspect during an interrogation has no bearing on the suspect's capacity to "comprehend and knowingly relinquish a constitutional right." *Id.*

The *Burbine* Court likewise rejected the idea that the police had a constitutional duty to "supply a suspect with a flow of information to help him calibrate his self-interest in deciding whether to speak or stand by his rights." *Burbine*, 475 U.S. at 422. In the absence of coercion, a suspect's waiver is valid as a matter of law when it is established that he knew he could remain silent and request an attorney and he understood that the State could use his statements against him. *Id.* at 422-23.

Significantly, the *Burbine* Court based its decision on an examination of the Fifth Amendment and determined that the Sixth Amendment right to counsel did not attach until the initiation of formal adversarial proceedings. *Id.* at 431. Acknowledging that the Sixth Amendment right to counsel attaches only when the government's role shifts from investigation to accusation, the court refused to extend this right to the process of custodial interrogation, which is part of the investigation process. The court was also reluctant to adopt a rule that shifted the inquiry from the state of mind of the suspect to the efforts and persistence of their attorney. *Id.* at 425-26. The Court did concede that the States could adopt different requirements for the

conduct of its employees as a matter of state law. *Id.* at 428.

The Court also addressed Mr. Burbine's argument that the conduct of the police was so offensive that it deprived him of the fundamental fairness guaranteed by the Due Process Clause of the Fourteenth Amendment. In dismissing this argument, the Court stated, "[w]e do not question that on facts more egregious than those presented here police deception might rise to a level of a due process violation," but that here, "the challenged conduct falls short of the kind of misbehavior that so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." *Id.* at 432-34.

Several states have rejected the *Burbine* decision by finding that state law granted different and more expansive rights to defendants during the period of interrogation. Ms. Corn cites several of these cases. *See, e.g., State v. Stoddard*, 206 Conn. 157, 537 A.2d 446 (1988); *Bryan v. State*, 571 A.2d 170 (Del. 1990); *Roeder v. State*, 768 S.W.2d 745 (Tex. Ct. App. 1988). In *Earls*, the Washington Supreme Court concluded the right to counsel under article I, section 9, of the Washington Constitution, and the Fifth Amendment were coextensive, and followed the analysis in *Burbine*. We will apply *Earls* here, but we question the underlying assumption that police may prevent or delay communication between a suspect and an attorney seeking to contact that suspect. "To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run." *State v. Haynes*, 288 Or. 59, 72, 602 P.2d 272 (1979).

Mr. Earls was arrested in January 1988 in connection with a murder that occurred in March 1987. Mr. Earls called his ex-wife from the jail and asked her to contact an attorney. She called an attorney who told her that he was interested in representing Mr. Earls. The attorney then called the jail and asked to speak to Mr. Earls. When this

request was refused, the attorney asked to leave his name and number so the police could have Mr. Earls call him back. The attorney did not inform the police that he was Mr. Earls' attorney and he did not tell the police that he did not want Mr. Earls questioned by police. The attorney also did not go to the police station and did not, at that time, consider himself retained as Mr. Earls' attorney. Several hours later, after Mr. Earls had confessed to the murder, he called the attorney and informed him of the confession. Mr. Earls assigned error only to the trial court's finding that the attorney's call did not negate the validity of Mr. Earls' waiver.

The *Earls* court limited its analysis to Mr. Earls' right to counsel under the Fifth Amendment and the Washington state counterpart, article I, section 9. Mr. Earls did not argue that the right to counsel granted in the Sixth Amendment should attach earlier under the state counterpart, article I, section 22 (amendment 10). *Earls*, 116 Wn.2d. at 374 n.5. Finding the protection of article I, section 9, to be coextensive with the protection of the Fifth Amendment, the *Earls* court, relying upon *Burbine*, refused to suppress the confession merely because an unretained attorney called and asked to leave a message. *Id.* at 380-81.

Ms. Corn attempts to distinguish both *Burbine* and *Earls* on several grounds. First, Ms. Corn points out that the attorney in *Earls* had not been retained at the time he called the station. This argument fails because under the analysis adopted in *Burbine* and *Earls*, none of the events occurring outside the presence of Ms. Corn had any impact on her capacity to understand and knowingly relinquish a constitutional right. In other words, as long as the analysis is conducted based on the Fifth Amendment right against self-incrimination, the waiver is valid as long as it can be shown that Ms. Corn understood and voluntarily relinquished her rights.

Second, Ms. Corn contends that unlike Mr. Earls and Mr. Burbine, she was questioned immediately after the incident, was emotionally distressed, and had no prior experience

with the criminal justice system. In effect, Ms. Corn is attempting to distinguish *Earls* and *Burbine* by raising questions concerning the voluntariness of the waiver. The holdings in *Burbine* and *Earls* cannot be distinguished on this basis. The *Burbine* and *Earls* courts addressed only the narrow issue of whether an otherwise valid waiver was vitiated because the police failed to inform the suspect that an attorney had attempted to contact the suspect during the interrogation. *Id.* at 372-73. Based on the record here, we conclude the waiver was voluntary and limit our review to Ms. Corn's argument that her otherwise valid waiver was vitiated by police conduct that denied her access to her attorney.

Recognizing the difficulty of making an argument based on *Earls*, *Burbine*, and the right against self-incrimination, Ms. Corn raises two arguments based on other theories. First, Ms. Corn suggests that the Sixth Amendment right to counsel is at issue here because this right attaches at the earliest possible moment pursuant to CrR 3.1(b)(1).[5] Ms. Corn asserts her statement must be suppressed because the police violated the requirements of this rule.

 It is well established that the Sixth and Fourteenth Amendments right to counsel attaches at the initiation of adversarial criminal proceedings. *Earls*, 116 Wn.2d at 374 n.5. The right to counsel under article I, section 22 (amendment 10) of the Washington Constitution does not provide more protection than the Sixth Amendment. *Id.* Moreover, the protections of CrR 3.1(c)(2)[6] are activated only after the accused requests an attorney. *State v. Kirkpatrick*, 89 Wn. App. 407, 413 n.2, 948 P.2d 882 (1997),

---

[5]CrR 3.1(b)(1) reads:

"The right to a lawyer shall accrue as soon as feasible after the defendant is taken into custody, appears before a committing magistrate, or is formally charged, whichever occurs earliest."

[6]CrR 3.1(c)(2) reads:

"At the earliest opportunity a person in custody who desires a lawyer shall be provided access to a telephone, the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in communication with a lawyer."

*review denied*, 135 Wn.2d 1012 (1998). It follows then that CrR 3.1(b)(1) does not grant additional rights, but rather reinforces the *Miranda* right to counsel. Contrary to the assertions of Ms. Corn, the language of CrR 3.1(b)(1) does not trigger the right to counsel at the earliest possible moment.

■ Ms. Corn's second argument is based on a due process analysis. In effect, she invokes the Washington counterpart of the Due Process clause, and asks this court to circumvent *Burbine* and *Earls* on this basis rather than the Fifth Amendment analysis employed by those courts. Conducting a *Gunwall* analysis, Ms. Corn asserts the due process clause of the Washington State Constitution grants greater rights than its federal counterpart and prohibits the police conduct here. Ms. Corn contends the police conduct here is different from that in either *Earls* or *Burbine* because the police (1) shuffled Ms. Corn through back doors and used routes that would prevent her from seeing her attorney; (2) misled her attorney as to her whereabouts; and (3) held her in isolation. In short, Ms. Corn concludes the police conduct here constitutes police "misconduct," and asks that we evaluate this conduct under a new due process standard derived from state law. To support this argument, Ms. Corn cites cases where state courts have rejected *Burbine* based on due process provisions in state constitutions. *See, e.g. State v. Stoddard*, 206 Conn. 157, 537 A.2d 446 (1988); *Haliburton v. State*, 514 So. 2d 1088 (Fla. 1987).

*Earls* sets forth the analytical framework applicable here. We decline Ms. Corn's invitation to reject *Burbine* under a due process analysis when the *Earls* court has already approved similar conduct under its examination of the right against self-incrimination as set forth in the Fifth Amendment and article I, section 9. The facts in the record before us are insufficient to trigger a separate analysis under either the state or the federal Due Process clause. Conducting our analysis under *Earls*, we conclude Ms. Corn freely, knowingly and intelligently chose to give up her right to

have the assistance of counsel. Under the circumstances here, nothing that occurred inside or outside of the interrogation room changed the fact that Ms. Corn knew she had the right to an attorney and that, had she requested one, all questioning would have ceased.

We affirm the decision of the trial court to grant a new trial.

BROWN and KATO, JJ., concur.