[No. 16131-5-III.   Division Three.   June 8, 1999.]

THE STATE OF WASHINGTON, *Respondent*, v. TED LOUIS
BRADFORD, *Appellant*.

*Suzanne Lee Elliott,* for appellant.

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Bruce Hanify, Deputy,* for respondent.

KURTZ, J. — Ted Louis Bradford was convicted of first degree rape and first degree burglary. On appeal, Mr. Bradford contends the court erred in admitting statements he made to police officers during an interrogation that was commenced while he was in custody on other charges. Mr. Bradford asserts the statements were obtained in violation of his rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution, and article I, section 9, of the Washington Constitution. Mr. Bradford further contends the State violated CrRLJ 3.2.1(d)(1) by unilaterally rescheduling his arraignment on the other charges so that the interrogation related to the rape incident could proceed without interruption. In addition, Mr. Bradford asserts the court erred in calculating his offender score. He also contends he received ineffective assistance of counsel when his trial attorney failed to object to the miscalculation of his offender score. We conclude Mr.

Bradford's confession was admissible and affirm his convictions.

## FACTS

*Crime.* On the morning of September 29, 1995, K.S. was raped in her home. Ms. S. was in the living room feeding her one-month-old infant when she heard an unfamiliar noise, peeked around the archway, and saw a man wearing a white nylon stocking as a mask. Ms. S. attempted to run with her baby, but the man grabbed her from behind and she ended up on the floor with her infant in her arms. The man straddled her and covered her face with his hand. The man told her not to look at him, but permitted her to place her screaming infant in the crib.

The man had on black jeans, a dull red and blue checkered flannel jacket, and white gloves. Although the man was wearing a white stocking over his head, Ms. S. could see that he had dark hair or dark blonde hair. Ms. S. was certain the man was a Caucasian or a light-skinned Hispanic. She described him as "thick," like a bodybuilder, but with a "little bit of a gut." Slightly less than five feet tall, Ms. S. described her assailant as about six feet tall or "half a head" taller than her husband. She stated that the man standing in her home "was a giant to me."

The man took her to the basement and ordered her to put on a mask over her face. From a small, black bag, he removed a pair of handcuffs. The man handcuffed her hands behind her back, undid her pants, pulled them down, and pushed her to the floor, facedown. The man straddled her and attempted vaginal penetration but was unsuccessful because he was "soft." The man then attempted anal penetration and was partially successful. Ms. S. did not believe that the man ejaculated.

The man then pulled Ms. S. up by her pants and led her upstairs. The man went through her purse and took two dollars. He also asked how much gas was in her van. When she answered "nine gallons," the man said, "Damn, not

enough." Ms. S. asked if she could go to her baby, who was still crying. The man took off the handcuffs and used a coat hanger to tie her to the crib by some of her belt loops. She still had the mask on her face. The man commented, "Spunky kid, huh?" He left, and Ms. S. heard a vehicle driving quickly away from the house, loud, "like . . . a bad muffler or one of those big four by fours with a big muffler."

*Confession.* In March 1996, the Yakima Police Department was investigating several indecent exposure reports. The investigation linked Mr. Bradford's white Toyota to the crimes. On March 11, Detective Rodney Light questioned Mr. Bradford about the crimes, first at Mr. Bradford's place of employment, and later at the police station. Mr. Bradford confessed and gave a statement to the detective. At both of these sessions, Mr. Bradford was read his *Miranda*[1] rights. Mr. Bradford was released after the questioning.

Because the rape case and the indecent exposure incidents had occurred in the same neighborhood, and because they both involved a suspicious car matching Mr. Bradford's Toyota, Detective Light and another detective assigned to that case, Detective Joseph Scherschligt, decided to interview Mr. Bradford. They discovered he had been arrested and jailed the previous day, a Sunday, on the lewd conduct charges. Shortly after 9:00 A.M., on Monday, April 1, the two detectives brought Mr. Bradford to an interrogation room at the police station. Once there, the two detectives informed Mr. Bradford that they wanted to talk to him about a "serious assault," and informed him of his *Miranda* rights. Mr. Bradford stated that he understood his rights, but would waive them and talk to the detectives.

Mr. Bradford denied any involvement in the rape. He initially told police he had been at work at the time of the incident, but changed his story when police informed him they had information indicating that he had missed work

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

that day. When Detective Light asked Mr. Bradford if he could have been home that day, Mr. Bradford responded that he was with his wife all day and that she drove him to the doctor's office. Mr. Bradford also told police that his wife would know whether he worked that day. Mr. Bradford later testified that he changed his story because "I did not think that detectives would lie to me and say that I was not at work if I was not."

Mr. Bradford was asked whether he would be willing to take a polygraph, and he agreed. As part of the polygraph procedure, Mr. Bradford was again advised of his *Miranda* rights. The polygraph examination started about 10:15 A.M. and ended at about 1:15 P.M.

During the polygraph examination, at approximately 11:00 A.M., Detective Light telephoned City Prosecutor Susan Woodard and was informed that Mr. Bradford had been arrested over the weekend and probably had a 1:30 P.M. court appearance. Detective Light told Ms. Woodard that Mr. Bradford would not be able to make his afternoon arraignment, as he was still being interviewed with regard to a rape investigation. Ms. Woodard asked the clerk's office to set the arraignment over for a day.

During the polygraph examination, Detective Light also telephoned Carrie Bradford to inquire about Mr. Bradford's whereabouts on the day of the incident. Detective Light later testified that Mrs. Bradford told him that she and Mr. Bradford had slept in the morning of the surgery. Mrs. Bradford later denied making this statement. She testified that she told Detective Light that she alone had slept in the day of the surgery.

After the polygraph examination had concluded, approximately 15 minutes before Mr. Bradford should have been taken to court for his preliminary appearance, the examiner asked him whether he wanted to go back to jail or continue talking with detectives. Mr. Bradford said he wanted to talk to the detectives. He was not informed about the rescheduling of his arraignment. He was asked, however, if he wanted anything to eat or drink. Mr. Brad-

ford stated that he did not, but he told the officers that he wanted to talk to his wife. Mr. Bradford was given access to a telephone and left alone.

Later Mr. Bradford was taken back to the interview room where his interrogation was continued. The interview was interrupted at 2:15 P.M. when the detectives were informed that an attorney was out in the hall and wanted to see Mr. Bradford. Kenneth Raber, the city's public defender, had been contacted by Mrs. Bradford, who had asked him to speak with her husband. After consulting with a deputy county prosecutor, the detectives told Mr. Raber that he could not speak with Mr. Bradford, unless Mr. Bradford asked for him.

At 4:10 P.M., the two detectives appeared to become exasperated with Mr. Bradford, and one of them left. Detective Scherschligt told Mr. Bradford, "I was not going to leave the room and that he needed to tell me the truth." The detective asked Mr. Bradford what was important to him. When Mr. Bradford stated "work," the detective told him he was not making any promises, but that he would talk to the prosecutor about getting Mr. Bradford out of jail so that he could return to work. At 4:28 P.M., Mr. Bradford told Detective Scherschligt that the rape had "just happened." He gave a statement confessing to the rape.

Detective Scherschligt spent a total of five and one-half hours with Mr. Bradford, not including the time Mr. Bradford was with the polygraph examiner. In explaining why he interrogated Mr. Bradford for such a lengthy period of time, Detective Scherschligt stated: "In speaking with Mr. Bradford, he denied the incident. And it was my belief that he was in fact the suspect and you have to work, or we worked through a period of time where Mr. Bradford was in denial." Six or eight times, Detective Scherschligt told Mr. Bradford, "I am not going to allow you to deny this anymore." The total interrogation, including polygraph examination, lasted eight and one-half hours. Mr. Bradford was asked on at least one occasion whether he wanted to continue talking with the detectives or go back to jail. He

was offered food and drink on at least three occasions, and was given dinner at the end of the day.

*CrR 3.1 Hearing.* At the CrR 3.1 hearing, Mr. Raber testified that after he was denied access to Mr. Bradford, he realized that he was representing Mr. Bradford on something more than misdemeanor charges. He called the prosecutor's office and spoke with two deputy prosecutors. They told him that "they found a case that said that the officers did not have to allow me to see Mr. Bradford." Mr. Raber said the prosecutors were aware that he had been retained and that he was being prevented from seeing his client. Mr. Raber said that he did everything he knew to let the police know he wanted to see his client. In all, Mr. Raber made one trip to the city building and three trips to the jail. Mr. Raber claims he was told Mr. Bradford had waived his right to an attorney and did not want to see him.

Relying on *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986), and *State v. Earls*, 116 Wn.2d 364, 805 P.2d 211 (1991), the court denied Mr. Bradford's motion to suppress his statement. The court reasoned that the State's failure to inform Mr. Bradford that his attorney was present at the police station did not have any bearing on Mr. Bradford's decision to waive his Fifth Amendment rights. The court also concluded "the circumstances were not coercive so as to overcome defendant's free will and his voluntary cooperation with the police." Relying on *State v. Stewart*, 113 Wn.2d 462, 780 P.2d 844 (1989), the court also concluded Mr. Bradford was in custody on "unrelated" charges and could waive his Fifth Amendment rights with regard to the rape and burglary charges. The court further stated that "any violation, if there be any, of the rule as pertains to the lewd charges would be one that would have to be handled by the court hearing those matters if that becomes pertinent to those issues in that case."

*Trial.* At trial, Mr. Bradford testified that he made the taped statement, not because he had raped Ms. S., but to gain release from interrogation. Mr. Bradford's defense was able to demonstrate significant discrepancies between the

taped confession and the actual crime. The defense compared Mr. Bradford, five feet seven and one-half inches tall, with the six-foot assailant described by Ms. S. Mr. Bradford stated he could not be the rapist because he was at work when the rape occurred, and he substantiated his alibi defense with pay records. Mrs. Bradford testified she picked Mr. Bradford up at work on the day of the rape and took him to have a vasectomy performed. Co-workers who testified recalled joking with Mr. Bradford about the scheduled vasectomy before he left that day.

Mr. Bradford's alibi defense was undermined by conflicting evidence as to whether he went to work on the day of the rape. Also, two of Ms. S.'s neighbors, who took early morning walks, testified they observed a white Toyota driving around the neighborhood in the second or third week of September 1995. One neighbor observed the man drive by and take a long look at the S. residence. This woman was later able to pick Mr. Bradford out of a police photomontage.

Mr. Bradford was convicted of first degree rape and first degree burglary. The trial judge determined, without objection, that Mr. Bradford's offender score was 2. His standard range for the first degree rape charge was 95 to 125 months and the standard range for the first degree burglary charge was 26 to 34 months. The court imposed 122 months on the rape count, and 34 months on the burglary count, with the sentences to run concurrently. Mr. Bradford appeals contending the trial court erred in admitting his statement and in calculating his offender score. He further contends he was denied effective counsel when his trial counsel failed to object to the calculation of the offender score at sentencing.

## ANALYSIS

Did the admission of Mr. Bradford's confession violate rights granted under the state or the federal constitution, or under applicable court rules?

Mr. Bradford contends the court's decision to admit his confession violated his rights under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and article I, section 9, of the Washington Constitution. Mr. Bradford asserts the State had an obligation to inform him of the presence of his attorney and to stop the interrogation to permit him to meet with his attorney, even though Mr. Bradford had not invoked his right to counsel when given his *Miranda* rights. He also asserts that statements made by police, and their unilateral decision to reschedule the arraignment on the misdemeanor charges, constituted egregious conduct that violated his right to due process. In the alternative, Mr. Bradford suggests his confession should be suppressed based on the State's failure to comply with a court rule, CrRLJ 3.2.1, in that police failed to take him before a magistrate on the misdemeanor charges before the close of the next court day.

██ ██ To protect the right against self-incrimination granted under the Fifth Amendment, custodial interrogation must be preceded by advice to the accused that they have the right to remain silent and the right to the presence of an attorney. *Miranda*, 384 U.S. at 479. The accused may waive the rights conveyed in *Miranda* warnings provided the waiver is made voluntarily, knowingly and intelligently. *Id.* at 444. A court must examine the totality of the circumstances to determine whether the relinquishment of the right was voluntary and whether the waiver was made with "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Burbine*, 475 U.S. at 421. The State must establish the voluntariness of the statement by a preponderance of the evidence. *Earls*, 116 Wn.2d at 378-79.

██ In rejecting Mr. Bradford's argument that his confession should have been suppressed, the trial court applied the holdings in *Burbine* and *Earls*. In *Burbine*, the United States Supreme Court held that federal constitutional rights were not violated when police failed to inform a suspect of the efforts of an attorney, who had been retained

without the defendant's knowledge, to contact the defendant while he was in custody. In reaching its decision, the *Burbine* Court concluded that information concerning an attorney's efforts to contact a suspect need not be forwarded to the suspect because this information had no bearing on the suspect's capacity to comprehend and relinquish a constitutional right. *Burbine*, 475 U.S. at 422. In *Earls*, the Washington Supreme Court followed *Burbine*, and further, concluded that the protections against self-incrimination in the state and the federal constitution are coextensive. *Earls*, 116 Wn.2d at 374-75.

In *State v. Corn*, 95 Wn. App. 41, 975 P.2d 520 (1999), we expressed our reservations about the holdings in *Burbine* and *Earls* that permit police to prevent or delay communication between a suspect and an attorney seeking to contact that suspect. As an abstract matter, the right of an accused person to consult with an attorney is so valued by our justice system that we require police to advise the suspect of this right before proceeding with a custodial interrogation. If the police had failed to perform this duty before Mr. Burbine or Mr. Earls had confessed, those courts unquestionably would have suppressed their confessions. Yet, under the holdings in *Burbine* and *Earls*, police need not tell an accused of the presence of an attorney immediately available to counsel them. The test of our commitment to a value is not our adherence to it as an abstract matter.

Mr. Bradford attempts to distinguish both *Burbine* and *Earls*. First, he argues the facts here are more compelling because the attorney did not call, but actually went down to the police station. However, given the holdings in both *Burbine* and *Earls*, Mr. Bradford cannot successfully argue that the police had an obligation to inform him of the presence of his attorney at the police station. As explained by the *Burbine* Court, "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." *Burbine*, 475

U.S. at 422. In other words, Mr. Bradford's Fifth Amendment right against self-incrimination is protected as long as it can be shown that Mr. Bradford understood and voluntarily relinquished his rights. The fact that an attorney did not call, but was physically present outside the interview room, is not relevant to the issue of whether the waiver was valid.

Mr. Bradford next contends there was a violation of due process rights granted under the Fourteenth Amendment. Mr. Bradford relies on the statement of the *Burbine* Court, that "on facts more egregious than those presented here police deception might rise to a level of a due process violation." *Burbine*, 475 U.S. at 432. Mr. Bradford contends police lied to him when they told him that he did not need counsel, that he would be questioned only about the lewd conduct charges, and that they would speak to the prosecuting attorney about releasing him to return to work. In addition, Mr. Bradford asserts the police took affirmative steps to interfere with the judicial process when they disregarded the mandate requiring that he be taken before a magistrate on the lewd conduct charges before the end of the next court day. To some extent, Mr. Bradford challenges these police tactics as a means of bolstering his argument that he should have been granted access to his attorney. Under the facts here, we apply *Burbine* and *Earls*, and address the due process concerns as a separate question.

Do the facts here rise to the level of a due process violation? In terms of due process violations, the *Burbine* Court requires conduct that "so shocks the sensibilities of civilized society as to warrant a federal intrusion into the criminal processes of the States." *Burbine*, 475 U.S. at 433-34. The police conduct here, even when considered as a whole, does not rise to that level. The statements made by police to Mr. Bradford were properly considered by the trial court as part of the inquiry under the Fifth Amendment into the voluntariness of the waiver. Similarly, while we are troubled by the State's failure to have Mr. Bradford arraigned on the misdemeanor charges within the time pe-

riod designated in the court rule, we reject Mr. Bradford's contention that this conduct is "egregious" and rises to the level of a due process violation. In this regard, we note the right to counsel as provided in court rules is not of constitutional origin. *State v. Greer*, 62 Wn. App. 779, 790 n.4, 815 P.2d 295 (1991) (examining right to counsel under CrR 3.1).

■ Mr. Bradford also asks us to reject the *Burbine* holding and conclude that the Washington Constitution grants additional rights under article I, section 9, which protects against self-incrimination.[2] This argument has already been addressed and rejected in *Earls*. *Earls*, 116 Wn.2d at 374-75. Relying on *State v. Russell*, 125 Wn.2d 24, 56-57, 882 P.2d 747 (1994), Mr. Bradford argues that *Earls* is not determinative because an independent interpretation of article I, section 9, may be performed on a case-by-case basis. This argument is also unpersuasive. The *Russell* court conducted an independent interpretation because *Earls* did not pertain to the admissibility of the fruits of an "un-Mirandized" confession. Here, *Earls* is applicable and we decline Mr. Bradford's invitation to conduct a *Gunwall*[3] analysis on the same issues resolved by the *Earls* court.

■ Mr. Bradford argues, as did the defendant in *State v. Stewart*, 113 Wn.2d 462, 780 P.2d 844 (1989), that when a Sixth Amendment right to counsel attaches in relation to some charge, this right prevents an in-custody defendant from waiving his Fifth Amendment right to counsel when questioned by the police in relation to other "related" charges.

■ ■ The right to counsel under the Sixth and Fourteenth Amendments, and under article I, section 22 (amendment 10), attaches only after the initiation of formal judicial proceedings against the defendant by way of formal

---

[2]Several states have rejected the *Burbine* decision and concluded that state law granted different and more expansive rights to suspects who are in custody. *See, e.g., State v. Stoddard*, 206 Conn. 157, 537 A.2d 446 (1988); *Bryan v. State*, 571 A.2d 170 (Del. 1990); *Haliburton v. State*, 514 So. 2d 1088 (Fla. 1987).

[3]*State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4TH 517 (1986).

charge, preliminary proceeding, indictment, information or arraignment. *Earls*, 116 Wn.2d at 374 n.5 (citing *Kirby v. Illinois*, 406 U.S. 682, 688-89, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972)). When a defendant's Sixth Amendment right to counsel has been invoked at arraignment, the defendant's Fifth Amendment right to counsel is not violated when the police interrogate him on unrelated charges, procure a *Miranda* waiver, and obtain a confession. *Stewart*, 113 Wn.2d at 478-79. There is no basis to conclude article I, section 22 (amendment 10), of the Washington Constitution should be interpreted to provide more protection than the Sixth Amendment. *State v. Medlock*, 86 Wn. App. 89, 99, 935 P.2d 693, *review denied*, 133 Wn.2d 1012 (1997).

It follows then that Mr. Bradford's argument is unpersuasive in light of the decisions in *Stewart* and *Earls*. Assuming Mr. Bradford's Sixth Amendment right to counsel attached with regard to the lewd conduct charges, the fact that he was in continuous custody did not prevent him from waiving his Fifth Amendment right to counsel in relation to the rape charge. Contrary to Mr. Bradford's assertions, the rape charge is sufficiently unrelated to the lewd conduct charges to permit the police to obtain a confession once Mr. Bradford waived his Fifth Amendment rights.

Alternatively, Mr. Bradford suggests his confession must be suppressed because the State failed to comply with CrRLJ 3.2.1. Under this rule, the State had a duty to take Mr. Bradford before a magistrate on the lewd conduct charges "as soon as practicable after the detention is commenced, but in any event before the close of business on the next court day." CrRLJ 3.2.1(d)(1).

The primary purposes of the preliminary appearance are a judicial determination of probable cause and judicial review of the conditions of release. *Westerman v. Cary*, 125 Wn.2d 277, 291, 892 P.2d 1067 (1994). Another purpose of the rule is to prevent unlawful detention and to eliminate the opportunity and incentive for application of improper police pressure. *Landrum v. State*, 326 Ark. 994, 998, 936 S.W.2d 505 (1996); *Commonwealth v. Rosario*, 422

Mass. 48, 51, 661 N.E.2d 71 (1996). If an unnecessary delay in the preliminary appearance occurs, statements given by the accused are not automatically excluded; rather, the court considers the delay as one of the factors to be taken into consideration in determining whether the confession was involuntary. *State v. Hoffman*, 64 Wn.2d 445, 450, 392 P.2d 237 (1964); *State v. Winters*, 39 Wn.2d 545, 549, 236 P.2d 1038 (1951); Romualdo P. Eclavea, Annotation, *Admissibility of Confession or Other Statement made by Defendant as Affected by Delay in Arraignment*, 28 A.L.R.4TH 1121 (1984).

In the present case, there was an unnecessary and unwarranted delay in Mr. Bradford's preliminary appearance before the court on the lewd conduct charges. While we do not condone this violation of the court rule and regard it as serious, it is but one of the factors to be taken into consideration in determining whether Mr. Bradford's confession was voluntary for purposes of the Fifth Amendment. Having reviewed the record here, we conclude the statement was voluntary. On numerous occasions during the day, Mr. Bradford was informed of his *Miranda* rights and each time he agreed to waive those rights. Moreover, after the polygraph examination, Mr. Bradford was asked whether he wanted to end the interrogation but voluntarily elected to continue talking to the detectives. He was not held incommunicado but given the opportunity to call his wife. Mr. Bradford was aware of his rights and the State's intention to use his statements against him. Furthermore, there is no indication that his decision not to invoke his rights was induced by threat or promise. Based on the totality of these circumstances, we conclude the trial court did not err in finding that Mr. Bradford knowingly and voluntarily waived his rights and that the confession was voluntary.

In sum, the admission of Mr. Bradford's confession did not violate his rights under the Fifth, Sixth, or Fourteenth Amendments to the United States Constitution or rights granted under article I, section 9, of the Washington Con-

stitution. In addition, based on the record here, the violation of CrRLJ 3.2.1(d)(1) did not render the confession involuntary and therefore inadmissible.

Did the court err in determining Mr. Bradford's offender score?

Relying on the reasoning in *State v. Johnson*, 92 Wn.2d 671, 600 P.2d 1249 (1979), Mr. Bradford contends the merger doctrine operates to preclude his conviction for the crimes of both first degree rape and first degree burglary. He urges this court to strike the burglary conviction because it merged with the rape conviction that had been elevated to first degree based on the felonious entry into the home. Based on the merging of these crimes, Mr. Bradford asserts the trial court erred when calculating his offender score. He argues his offender score should have been a zero rather than a two. In addition, Mr. Bradford contends his trial counsel was ineffective and failed to raise this issue at sentencing.

The burglary antimerger statute, RCW 9A.52.050, provides:

> Every person who, in the commission of a burglary shall commit any other crime, may be punished therefor as well as for the burglary, and may be prosecuted for each crime separately.

The clear statutory language of RCW 9A.52.050 permits the trial court to punish "any other crime" committed during the course of a burglary. *State v. Sweet*, 91 Wn. App. 612, 620, 959 P.2d 677 (1998), *review granted*, 137 Wn.2d 1007 (1999). "The Legislature has clearly spoken on the issue and therefore burglary does not merge with first degree rape." *State v. Bonds*, 98 Wn.2d 1, 15-16, 653 P.2d 1024 (1982). In addition, the burglary antimerger statute gives the sentencing judge discretion to punish for burglary, even where the burglary and an additional crime encompass the same criminal conduct. *State v. Lessley*, 118 Wn.2d 773, 781, 827 P.2d 996 (1992).

Mr. Bradford's argument that the burglary charge

merged with the rape charge is untenable. The court did not err in calculating his offender score. Mr. Bradford received effective assistance of counsel at sentencing.

Mr. Bradford's convictions are affirmed.

BROWN, J., concurs.

SCHULTHEIS, C.J. (dissenting) — Once again we encounter the State's manipulation of criminal procedure in pursuit of a confession. And once again we come up against *Burbine* and *Earls*, which hold that a defendant's waiver of the right to counsel is knowing and intelligent even when police refuse to inform the defendant an attorney is trying to reach him. *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135, 89 L. Ed. 2d 410 (1986); *State v. Earls*, 116 Wn.2d 364, 805 P.2d 211 (1991). Relinquishment of the *Miranda*[4] rights to remain silent and to the presence of an attorney must be "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Burbine*, 475 U.S. at 421. Because I find Ted Bradford's waiver was procured at least in part by deception, I would reverse.

*Burbine* declares that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." 475 U.S. at 422. When police prevent the suspect from learning information that could affect his decision to abandon his rights, however, I believe the police conduct must be examined in the light of the " 'totality of the circumstances surrounding the interrogation[.]' " *Burbine*, 475 U.S. at 421 (quoting *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S. Ct. 2560, 61 L. Ed. 2d 197 (1979)). Police officers here interrogated Mr. Bradford for over eight hours, during which time they failed to deliver up Mr. Bradford for arraignment on the lewd conduct charges and declined to inform him of his right to appear at the arraignment, where he could have been

---

[4]*Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694, 10 A.L.R.3D 974 (1966).

released. Not only did they violate CrRLJ 3.2.1(d)(1), but at the time arraignment should have occurred they told Mr. Bradford his only options were to go back to jail or to continue talking with them. When Mr. Bradford's attorney arrived at the station for the arraignment, the officers refused to allow him access to his client and told him, falsely, that his client did not wish to talk to him. All these events occurred before Mr. Bradford had confessed.

Even *Burbine* recognizes that police deception may rise to the level of a due process violation. 475 U.S. at 432. Such factors as undue delay in arraignment, failure to inform the suspect of his rights and refusal to inform the suspect that legal counsel is available and wishes to speak to him are all relevant to the issue of voluntary self-incrimination during interrogation. *See State v. Self*, 59 Wn.2d 62, 72, 366 P.2d 193 (1961) (citing *Culombe v. Connecticut*, 367 U.S. 568, 601, 81 S. Ct. 1860, 6 L. Ed. 2d 1037 (1961)), *cert. denied*, 370 U.S. 929 (1962). Due process requires fundamental fairness, integrity and honor in the operation of the criminal justice system. *Burbine*, 475 U.S. at 467 (Stevens, J., dissenting). I simply cannot condone the procedural maneuvers used here to sidestep Mr. Bradford's rights to arraignment, assignment of counsel and possible avoidance of the custodial interrogation. Accordingly, I must dissent.

Review denied at 139 Wn.2d 1022 (2000).