[No. 24896-4-II. Division Two. April 6, 2001.]

THE STATE OF WASHINGTON, *Respondent*, v. PEPE JAQUEZ, *Appellant*.

700

*Linda J. King*, for appellant (appointed counsel for appeal).

*Gerald A. Horne*, *Prosecuting Attorney*, and *Kathleen Proctor*, *Deputy*, for respondent.

HUNT, A.C.J. — Pepe Jaquez appeals a jury conviction for

first degree robbery with a deadly weapon enhancement. We hold (1) that the trial court erroneously allowed Jaquez to be shackled during trial without first determining that restraint was necessary and (2) that such action prejudiced Jaquez's right to a fair trial. Accordingly, we reverse and remand for a new trial.

## FACTS

### I. The Robbery

At approximately 3:30 P.M. on December 15, 1998, Janet Wade was standing alone at the counter inside her Tacoma antique store, Blessed Treasures, at 2703 Sixth Avenue. A man entered the store, put a white plastic bag on the counter, pulled a knife, and told Wade she "better put the money in the bag." When Wade attempted to open the cash register, she pushed the wrong button. The man used the knife to pop open the cash register drawer, took out two $5 bills,[1] pulled the drawer out with an ungloved hand, threw the drawer on the floor, and left.

Wade called 911, walked to the front door to observe the direction in which the robber was headed, and saw her husband coming into the store. As Wade and her husband stood in front of the store, she saw the robber disappear to the left around a corner, along the Oakes Street side of the store. She told her husband to stop the man, who was running as Wade's husband gave chase. Wade then saw a man "c[o]me back around . . . from the alley side [of the business]," get into a car parked in front of her store, and drive away fast, but without "skid[ding] the tires or anything like that." She could not say whether this man was walking or running. Nor did she know how long the car had been parked there.

While she stood watching these events transpire, Wade described the robber to the 911 operator. She first described him as "a mixed black/white male" or "mixed black and

---

[1] This was the only cash in the drawer.

white," with olive skin. After the car pulled away from the curb, and assuming that the driver was the same man who had robbed her, Wade gave the vehicle license number to the 911 operator.

Only *later* did Wade report that the robber "*could* have been Hispanic."[2] (Emphasis added.) The driver of the car, whose license plate number Wade reported to the police, was Hispanic. Jaquez was that driver.

## II. JAQUEZ'S ARREST

Minutes later, police officers determined that Jaquez's mother was the registered owner of the vehicle Wade had reported, and they went to Jaquez's mother's home. The car with the reported license plate was parked across the street. Upon learning that the driver might be next door, the officers went to the adjacent apartment. A woman came out of the apartment and told them that her boyfriend and Jaquez were inside hiding in closets.[3] Eventually Jaquez surrendered. The police placed him in a patrol car, arrested him on an outstanding warrant, and advised him of his rights. Jaquez asked for an attorney.

Within 45 minutes of the robbery, the police drove Wade to the patrol car in which Jaquez was sitting. Their purpose was to determine whether Wade could identify Jaquez as the robber. Jaquez refused to get out of the car for the showup and hid his face. Wade could not see his face or identify him. The next day she identified Jaquez in a photomontage.

## III. TRIAL

The State charged Jaquez with one count of first degree

---

[2] At trial the defense argued that when Wade saw Jaquez (a Hispanic) get into his mother's car and drive away after stopping at a job placement office down the street, she mistakenly believed him to be the robber she had just described to 911 as "a half black/white male."

[3] Jaquez testified they hid because they each had outstanding arrest warrants, which was true.

robbery with a deadly weapon enhancement. The case was set for a jury trial.

## A. Shackling

Before voir dire, the attorneys addressed the shackling of Jaquez during trial. The prosecutor noted that jail policy required Jaquez to wear leg shackles. Defense counsel responded:

> Your Honor . . . oftentimes we try to conceal the fact that [defendants] have leg irons on, and I have had juries tell me that it looked deceitful. So I am not going to try to do that. I understand the security reasons for it. I understand that's a priority for the jail . . . *Obviously I object to use of shackles* because of the incriminating nature of it, but I also understand what the Court's ruling would be and what all judges rulings are, and that is that security procedures have to be followed by the jail staff.

2 Report of Proceedings at 3-4 (emphasis added). The record strongly suggests that the trial court required Jaquez to wear leg shackles throughout the trial.[4] The record reflects no reason other than standard jail policy.

## B. Showup

Jaquez moved in limine to suppress any reference to his refusal to participate in the showup after his arrest. The State contended that Jaquez's refusal was admissible evidence to show consciousness of guilt. Neither counsel produced authority in response to the court's request. Jaquez's counsel argued that it was "an issue primarily of relevancy," emphasizing that Jaquez was arrested on an outstanding, unrelated warrant and was not told that he was also a robbery suspect. Without considering the prejudicial effect under ER 403's balancing test, the court ruled that the evidence was relevant and, therefore, admissible under ER 402. The court also noted its willingness to revisit this

---

[4] The State does not claim otherwise.

ruling if it were confirmed that the police never told Jaquez that he was a robbery suspect.

### C. Fingerprint

Officer Kristoffersen lifted only one latent fingerprint from the register drawer at Blessed Treasures; this print did not match Jaquez's fingerprints. The parties later stipulated that the latent print did not match Jaquez, the Wades, or their two children. Nor did any other prints from the store match Jaquez.

### D. Victim's Testimony; Contrast with Earlier Statements

Wade testified that the robber wore a black jacket with an orange lining, white T-shirt, blue jeans, and black-and-white-striped tennis shoes. But during the earlier investigation, Wade had not told Officer Barrett that the robber's jacket had a bright orange lining, although she acknowledged at trial that the lining was "a pretty distinctive color."

Similarly, Wade had also previously described the robber's jacket to Detective Lynch as simply a "puffy black coat," without mentioning an orange lining. But the day after the robbery, Lynch had shown Wade the black jacket with visible and bright orange lining, seized from the apartment in which Jaquez had been hiding. Wade handled the jacket, observed the lining, and told Lynch that "it *could* have been the [robber's] coat." (Emphasis added.) Lynch did not show Wade any other items of Jaquez's clothing at that time.

During the investigation Wade told Officer Barrett she could *not* see the color of the shirt the robber was wearing. At trial Wade testified that she could see the robber's T-shirt "[f]rom the neck probably to his chest," but she did not recall any emblem or writing on the shirt. At the time of his arrest, Jaquez was wearing a white T-shirt with a distinctive, large, bright blue emblem on the front.

### E. Jaquez's Testimony

Jaquez testified on his own behalf. He explained that on December 14, he went to Labor Works, a temporary job agency, to check on a job for 4:00 P.M. that day. Labor Works placed him in a swing shift janitorial position at Weyerhaeuser from 5:30 P.M. to 11:30 P.M. He knew that if he performed well, there was a good chance of being hired for the same employer again.

The next morning, which happened to be the day of the robbery, Jaquez left the house with his mother to pick up his check from Labor Works for the previous day's work. Labor Works asked if he wanted to work that morning, but he told them he had a job interview elsewhere at 11 A.M. Labor Works told Jaquez to return that afternoon for a possible swing shift position.

After leaving Labor Works, Jaquez and his brother drove their mother's car to a job interview at Kaiser Aluminum in Federal Way. They returned to Tacoma around 2:30 P.M. and "went home and ate." Jaquez called his mother around 3:30 P.M. to confirm that she would get a ride home from work with a friend and pick up Jaquez's children from day care so he could check on the possible job at Labor Works. Jaquez bought gas on the way back to Labor Works. He parked about a half-block from Labor Works, in front of Blessed Treasures, because he could not find a closer spot. Labor Works told him the swing shift position was not available. Jaquez returned to his mother's car and left. Jaquez denied going into Blessed Treasures or ever seeing Wade.

Jaquez went to a 7-11 to buy a beer and then went to his friend's apartment. When the police arrived, he and his friend hid because both had outstanding arrest warrants.[5] Jaquez surrendered and police took him into custody. They asked him to participate in an elimination lineup. He requested an attorney. Jaquez insisted that no one ever told

---

[5] Two weeks earlier, Jaquez had received notice of this arrest warrant for obstructing a police officer and reckless driving "from six years beforehand."

him he was a robbery suspect. The record does not show otherwise.

## F. Corroborating Testimonies

Donna Stucker is a building supervisor for Weyerhaeuser Properties, providing janitorial services for Weyerhaeuser in Tacoma and Federal Way. She testified that she requested outside help for the night of December 14, and that Labor Works sent Pepe Jaquez, who worked that night for Weyerhaeuser. If the outside help does good work and more than one day's work is needed, she usually requests that person again because it saves retraining time. She remembered Jaquez's name and noted that much outside help was needed for December 14 and 15. She did not recall any problems with his work.

Carolyn Starr, Jaquez's mother, testified that Jaquez was living with her in December 1998. At about 6:30 A.M. December 15, they went to Labor Works to pick up his paycheck, cashed the check so he could give her some money, and went to Stadium Thriftway to buy lattes before he dropped his children at day care and his mother at her job. Jaquez needed Starr's car for a job interview, so she made other arrangements for transportation home from work. Katherine Zorns, Starr's co-worker, testified that she gave Starr a ride home from work on December 15.

## G. Verdict and Life Sentence

The jury convicted Jaquez of first degree robbery with a deadly weapon. The court sentenced him as a persistent offender to life imprisonment without possibility of parole.

## ANALYSIS

### I. Shackling

Jaquez contends that he was unconstitutionally shackled during trial. Based on the record and the parties' arguments, we conclude that he was shackled during trial and

assume for purposes of this appeal that the jury viewed the shackles.[6] The question before us is whether the shackling here was reversible error.[7]

### A. Standard of Review

■■■ Where an error infringes on a defendant's constitutional rights, the error is presumed prejudicial and the State bears the burden of proving that the error is harmless. *State v. Caldwell*, 94 Wn.2d 614, 618, 618 P.2d 508 (1980); *State v. Easter*, 130 Wn.2d 228, 242, 922 P.2d 1285 (1996). "A claim of unconstitutional shackling is subject to harmless error analysis." *State v. Hutchinson*, 135 Wn.2d 863, 888, 959 P.2d 1061 (1998). A constitutional error is harmless only if the reviewing court is convinced beyond a reasonable doubt that any reasonable jury would reach the same result absent the error. *Easter*, 130 Wn.2d at 242.

### B. No Factual Justification for Shackles

■ "It is well settled that a defendant in a criminal case is entitled to appear at trial free from all bonds or shackles except in extraordinary circumstances." *State v. Finch*, 137 Wn.2d 792, 842, 975 P.2d 967 (1999). This entitlement assures that a defendant receives a fair and impartial trial guaranteed by both the Sixth and Fourteenth Amendments to the United States Constitution and article I, sections 3 and 22 (amendment 10) of the Washington Constitution. *Finch*, 137 Wn.2d at 843.

---

[6] The record does not explicitly reflect that the jury saw Jaquez shackled during the trial. But such conclusion is a reasonable inference from the defense attorney's reluctance to attempt to hide the shackles (because jurors interpret such action as deceitful) and the court's response. Nor does the State below or on appeal contend to the contrary.

[7] The State argues that Jaquez did not properly preserve this issue with an appropriate objection below; we disagree. The record clearly reflects counsel's "object[ion] to the use of shackles because of the incriminating nature of it." That counsel did not belabor the point appears understandable in light of the Pierce County Superior Court's previous standard practice of using shackles in accordance with jail staff security procedures, without additional case-by-case inquiry. But even if this "objection" was not sufficient to preserve the issue, the error was of constitutional magnitude and Jaquez may raise it for the first time on appeal under RAP 2.5(a).

Restraining a defendant during trial infringes upon the right to a fair trial by violating the presumption of innocence, restricting the ability of an accused to assist his attorney during trial, and offending "the dignity of the judicial process." *Finch*, 137 Wn.2d at 845. Use of restraints also tends to prejudice the jury against the defendant to the point that it is " *'inherently prejudicial'* " to use them because they are " 'unmistakable indications of the need to separate a defendant from the community at large.' " *Finch*, 137 Wn.2d at 845 (quoting *Holbrook v. Flynn*, 475 U.S. 560, 568-69, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986)).

■ ■ Therefore, a court should employ "close judicial scrutiny" to determine whether restraints are necessary during trial. *Finch*, 137 Wn.2d at 846. A court "must"

> "exercise discretion in determining the extent to which courtroom security measures are necessary to maintain order and prevent injury. *That discretion must be founded upon a factual basis set forth in the record. A broad general policy of imposing physical restraints . . .* because [the defendant] may be "potentially dangerous" is a failure to exercise discretion."

*Finch*, 137 Wn.2d at 846 (quoting *State v. Hartzog*, 96 Wn.2d 383, 400, 635 P.2d 694 (1981)) (emphasis added). The trial court here failed to meet the *Finch* standard on two key grounds.

First, the sole reason for the trial court's allowing the use of restraints was because it was general jail policy. Under *Finch*, a decision to allow the use of leg restraints based solely on jail policy is clearly erroneous. *Finch* explicitly states that a court's decision to defer to the security policy of correctional officers is unjustifiable.[8] *Finch*, 137 Wn.2d at 853.

---

[8] At oral argument, the State attempted to justify the trial court's failure to make a proper record concerning the use of shackles because Jaquez's trial concluded a few days before *Finch* was filed. This argument fails: *Finch* relied on a 1981 case, published well before Jaquez's trial. *Finch*, 137 Wn.2d at 846 (relying on *State v. Hartzog*, 96 Wn.2d 383, 400, 635 P.2d 694 (1981) (requiring a trial court to set forth in the record its reasons for requiring a defendant to wear shackles)).

Second, the trial court established no factual basis justifying restraints specific to Jaquez. For example, the record contains no findings that Jaquez was disruptive during court proceedings, that he posed an escape risk, or that he posed a threat of harm to himself or others. But *Finch* explicitly requires a court, in the exercise of its discretion, to establish for the record a factual basis justifying the use of security measures. *Finch*, 137 Wn.2d at 846. We presume that shackling Jaquez without first enumerating the reasons for this extraordinary measure is *"inherently prejudicial"* error. *See Finch*, 137 Wn.2d at 845 (citing *Holbrook*, 475 U.S. at 568-69).

### C. ERROR NOT HARMLESS

■ Moreover, here, we do not deem the trial court's shackling error harmless because the evidence against Jaquez was circumstantial, relatively weak, and contradicted by other credible evidence. Wade's identification of Jaquez in a photomontage the day after the robbery is the only direct evidence linking Jaquez to the crime. Taken in light of the substantial exculpatory evidence presented by the defense, it is reasonably likely that the jurors' daily observation of Jaquez in shackles had a prejudicial effect.

The State's case depended almost entirely on the credibility of the sole eyewitness, Wade, whose recollection of the robbery was fraught with inconsistencies. She initially described the robber to the 911 operator, moments after the robbery, as a "mixed black and white" man. This was inconsistent with her later description, after she observed Jaquez get into his mother's car and drive away, of the robber as possibly "Hispanic." Further, her initial description of the robber's coat as simply "black" was inconsistent with her trial testimony, where for the first time she mentioned the coat's distinctive orange lining.[9] Her earlier

---

[9] The day after the robbery, the police had shown Wade Jaquez's jacket with the orange lining.

statement to Officer Barrett that she could not see the robber's shirt color was inconsistent with her later description of a simple white T-shirt. And her later description of a simple white T-shirt was at odds with the shirt Jaquez had been wearing—one with a large, distinctive blue emblem on the front that would have been clearly visible had the jacket been unzipped in the manner Wade described in her trial testimony.

Wade's recounting of the robbery required the jury to believe that: (1) a robber in a black coat escaped out the door of the store; (2) ran past a black car parked on the street in front of the store; (3) *ran* down the block and around a building;[10] and (4) then *walked* back to that car and drove away without skidding the tires "or anything like that." Wade made these observations while she stood in front of the store while talking to the 911 operator on a cordless phone.

Finally, there was no physical evidence connecting Jaquez to the crime. Although police arrested Jaquez within minutes of the robbery, they found no evidence of any robbery on his person or in his car: They found no knife of the type Wade said the robber used; they found no money stolen from the cash register. Moreover, police did not find Jaquez's fingerprints anywhere inside the store. Although Wade testified that the robber had touched the cash register with his bare hand, the fingerprint the police lifted from the cash register did not match Jaquez's.

Furthermore, Jaquez offered a reasonable, corroborated explanation for being near Blessed Treasures at the time of the robbery: He was reporting for a possible temporary job at a nearby temporary employment agency, which had sent him out on a job the previous day and suggested that he return. Several witnesses corroborated various parts of Jaquez's explanation. The Weyerhaeuser supervisor confirmed that: (1) the temporary employment agency had sent Jaquez to work for her the day before; (2) it was her policy

---

[10] Mr. Wade's testimony actually established that the robber was running.

to have those who performed well return; (3) she could remember no problems with Jaquez; and (4) they did need additional temporary help the next day. Jaquez's mother confirmed some of the details of Jaquez's temporary employment, job search, and use of her car. And her fellow co-worker confirmed having given her a ride home while Jaquez used his mother's car. In short, Jaquez presented a plausible defense that because he happened to walk past Wade's store shortly after the robbery, she mistakenly believed him to be the robber, even though he did not match her initial 911 description of the robber and his clothing.

Based on this record, it is reasonable to conclude that the jury's viewing of Jaquez in shackles throughout the trial could likely have induced the jury to find him guilty. The error, therefore, was not harmless beyond a reasonable doubt, and Jaquez is entitled to a new trial.[11]

## II. SHOWUP: EVIDENCE OF "GUILTY CONSCIENCE"

Jaquez argues that the trial court erred in admitting his refusal to participate in a showup as evidence of a guilty conscience. Jaquez's trial counsel argued that the evidence was not relevant because it did not unambiguously show consciousness of guilt. Although counsel characterized the matter as "an issue primarily of relevancy," he also argued that the proffered evidence was more prejudicial than probative.[12]

But the trial court did not balance the probative value

---

[11] Because we reverse based on trial court error, we do not reach Jaquez's related claim of ineffective assistance of counsel. Nor do we address his argument concerning cumulative error.

[12] The State contends that Jaquez preserved the objection below only on relevancy grounds and, because he never argued otherwise at trial, he is therefore barred from raising additional grounds now. But the record shows that trial counsel invited the court to engage in the required ER 403 balancing test: He essentially argued that because Jaquez had invoked his right to counsel, his lying down in the squad car seat during the showup was too ambiguous to survive ER 403 analysis, thereby rendering his attempt to avoid the showup inadmissible under ER 402—Jaquez's evasive action could indicate a guilty conscience, but it could also indicate an unwillingness to proceed with the showup without advice of counsel while under arrest and having invoked his right to counsel.

against the prejudicial effect of the evidence under ER 403 and, instead, ruled the evidence admissible as relevant under ER 402. The trial court also noted that it would revisit the issue if it became clear that the police failed to advise Jaquez that he was a suspect in the robbery. Because the showup issue may arise on retrial, we now address it.[13]

Jaquez contends that his refusal to cooperate at the showup is not admissible to show guilty conscience without infringing on his Fifth Amendment right against self-incrimination and his Sixth Amendment right to counsel. He argues that his evasive actions were reasonable and not indicative of guilty conscience, because at the time of the showup: (1) he was already under arrest on other outstanding warrants; (2) the police had advised him of his *Miranda*[14] rights and he had invoked his right to counsel; (3) he reasonably believed that he would be able to consult a lawyer before being asked to cooperate further with the police; and (4) the police had not informed him that he was a suspect in the robbery for which the showup was being conducted.

## A. RIGHT TO COUNSEL

Typically the courts have not deemed an investigatory showup to be as intrusive as interrogation; thus, the right to counsel does not attach. There are three primary reasons for a showup: (1) the need for a quick solution to the crime while the perpetrator may still be in the vicinity; (2) the desirability of fresh, accurate identification by the victim; and (3) the possible exoneration of the suspect. *State v. Hoffpauir*, 44 Wn. App. 195, 203, 722 P.2d 113 (1986) (citing *United States v. Kessler*, 692 F.2d 584 (9th Cir. 1982); *State v. Hudson*, 508 S.W.2d 707 (Mo. Ct. App. 1974)). *See also* 12 ROYCE A. FERGUSON, JR., WASHINGTON PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 3212 at 730 (1997) (policy concerns for

---

[13] We need not address the remaining issues that Jaquez raises on appeal.

[14] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

a showup include allowing the release of an innocent suspect).

## 1. Sixth Amendment

■ The United States Supreme Court has held that the Sixth Amendment right to counsel does not attach when a showup occurs before filing of charges because "it is only then that the government has committed itself to prosecute." *Kirby v. Illinois*, 406 U.S. 682, 689, 92 S. Ct. 1877, 32 L. Ed. 2d 411 (1972). The Court reasoned, "It is this point . . . that marks the commencement of the 'criminal prosecutions' to which alone the explicit guarantees of the Sixth Amendment are applicable." *Kirby*, 406 U.S. at 690.

Washington courts have embraced *Kirby* and extended it to article I, section 22 of the state constitution, holding: The state constitutional right to counsel, like its federal counterpart, "attaches only after the initiation of formal judicial proceedings against the defendant by way of formal charge, preliminary proceeding, indictment, information or arraignment." *State v. Bradford*, 95 Wn. App. 935, 947-48, 978 P.2d 534 (1999) (citing *State v. Earls*, 116 Wn.2d 364, 374 n.5, 805 P.2d 211 (1991)). *See also State v. Copeland*, 89 Wn. App. 492, 499, 949 P.2d 458 (1998).

Here, we face a hybrid situation: Although Jaquez had not yet been charged with the robbery for which the showup was conducted, he was already under arrest for crimes for which he had previously been charged and for which arrest warrants had issued. Thus, under *Bradford* and *Kirby*, Jaquez had no constitutional right to consult with counsel before or during the robbery showup, even though he would have been entitled to contact counsel had the officers attempted to question him about the offenses for which they had arrested him on the warrants.

## 2. CrR 3.1(c)(2)

■ But there is a separate basis upon which Jaquez was

entitled to consult with counsel before the showup. CrR 3.1(c)(2) provides:

> At the earliest opportunity a person in custody who desires a lawyer shall be provided access to a telephone, the telephone number of the public defender . . . and any other means necessary to place the person in communication with a lawyer.

We compared the constitutional rights to counsel to CrR 3.1(c)(2) in *State v. Kirkpatrick*, 89 Wn. App. 407, 413-14, 948 P.2d 882 (1997):

> While CrR 3.1(c)(2) appears similar to the *Miranda* warning, it actually serves a different purpose. CrR 3.1(c)(2) is designed "to provide a meaningful opportunity to contact a lawyer." AMERICAN BAR ASSOCIATION PROJECT ON MINIMUM STANDARDS FOR CRIMINAL JUSTICE, STANDARDS RELATING TO PROVIDING DEFENSE SERVICES § 7.1 cmt. d at 62 (Approved Draft, 1968).[3][15] The *Miranda* warning, on the other hand, is designed to prevent the State from using presumptively coerced and involuntary statements against criminal defendants. *Connecticut v. Barrett*, 479 U.S. 523, 528, 107 S. Ct. 828, 93 L. Ed. 2d 920 (1987). Therefore, the *Miranda* warning is only "an important first step toward informing the person of the nature of his right to the assistance of counsel." Approved Draft, cmt. a at 60 (emphasis added). "The fact that a warning valid within the meaning of *Miranda* has been made should not in itself be considered to fulfill the requirement of a formal offer [of counsel pursuant to CrR 3.1(c)(2)]." Approved Draft, cmt. b at 61.

We held that police officers in *Kirkpatrick* did not adhere to CrR 3.1(c)(2) where they made no effort to contact an attorney when a defendant first requested counsel.

■ Similarly here, the record suggests that the officers did not act at the earliest opportunity to allow Jaquez to contact an attorney. Rather, it appears that they made

---

[15] Footnote 3 of *Kirkpatrick* reads as follows: " 'The various parts of Rule 3.1 were extracted from and are almost identical to standards suggested by the . . . ABA's Project on Minimum Standards for Criminal Justice in Providing Defense Services. . . .' CRIMINAL RULES TASK FORCE, WASHINGTON PROPOSED RULES OF CRIMINAL PROCEDURE Rule 3.1 gen. cmt. at 15 (West Publ'g Co. 1971)."

Jaquez wait at least 45 minutes[16] while other officers drove Wade to Jaquez's location for an attempted showup identification. We next determine whether this violation of CrR 3.1(c)(2) mandates suppression of Jaquez's evasive action during the attempted showup.

### 3. HARMLESS ERROR

 Under *Kirkpatrick*, failure to comply with CrR 3.1(c)(2) does not mean automatic suppression of evidence. As Judge Bridgewater notes in his dissent in *Kirkpatrick*,

> The rights provided in CrR 3.1(c)(2) are not of constitutional origin, thus we apply the nonconstitutional harmless error test. *State v. Greer*, 62 Wn. App. 779, 790 n.4, 815 P.2d 295 (1991); *State v. Clark*, 48 Wn. App. 850, 863, 743 P.2d 822, *review denied*, 109 Wn.2d 1015 (1987).

89 Wn. App. at 417. Although Judge Bridgewater would have found no error, *Kirkpatrick*, 89 Wn. App. at 417, the majority found the CrR 3.1(c)(2) violation to have been harmless error because the other evidence in the case was so strong:

> While we hold that Kirkpatrick's counsel erred when he did not pursue an argument under CrR 3.1(c)(2), we conclude that, within a reasonable probability, the verdict would have been the same even if the error had not been made.

*Kirkpatrick*, 89 Wn. App. at 416. But here, as we have previously noted, the other evidence was not so strong that we can say that within a reasonable probability the verdict would have been the same had the error not been made.

Yet Jaquez has not alleged how the showup or the trial would have differed had he been able to contact counsel in advance: He did not allege that the showup was impermissibly suggestive, such that it might have been conducted differently if counsel had been present. Nor does he dem-

---

[16] We cannot tell from the record the duration of the wait. One officer testified that Wade was brought to the scene within 45 minutes of the time the police were apprised of the robbery.

onstrate that the showup might not have occurred at all had counsel been present. Thus, we hold that even if the police violated CrR 3.1(c)(2), the error was harmless.

## B. Fifth Amendment Right to Remain Silent

██ The U.S. Supreme Court has held that neither a showup nor a lineup implicates the Fifth Amendment. *United States v. Wade*, 388 U.S. 218, 87 S. Ct. 1926, 18 L. Ed. 2d 1149 (1967) (lineup); *Kirby*, 406 U.S. 682 (showup). The *Wade* Court noted, "We have no doubt that compelling the accused merely to exhibit his person for observation by a . . . witness prior to trial involves no compulsion of the accused to give evidence having testimonial significance." *Wade*, 388 U.S. at 222. *Kirby* extended the *Wade* logic to a preaccusatorial "showup," such as the one here, and held that the Fifth Amendment privilege was "in no way implicated." *Kirby*, 406 U.S. at 687. Thus, Jaquez's Fifth Amendment argument fails.

Reversed and remanded for a new trial.

Houghton and Bridgewater, JJ., concur.