241 P.3d 456 (2010)
STATE of Washington, Respondent,
v.
Steven Henry MULLINS, Appellant.
No. 64936-1-I.
Court of Appeals of Washington, Division 1.
November 1, 2010.
*458 Anne M. Cruser, Kalama, WA, for Appellant.
David H. Bruneau, Thurston County Prosecutor's Office, Olympia, WA, for Respondent.
BECKER, J.
¶ 1 Appellant Steven Mullins was arrested for murdering his wife. The detectives who took him into custody were completing prebooking procedures at the Thurston County jail when Mullins, who previously had invoked his right to counsel, voluntarily made a series of incriminating statements in their presence. Mullins contends those statements should have been suppressed because he was not put in touch with an attorney as soon as he arrived at the jail. We conclude CrR 3.1, the court rule mandating that a person in custody be placed in communication with a lawyer at "the earliest opportunity," was not violated under these circumstances. We also reject Mullins' claim that trial counsel was ineffective for not requesting lesser included offense instructions.
¶ 2 Mullins and his wife Amy lived in Thurston County. Amy decided to separate. In July 2007, she moved into a house a mile or so away from where Mullins lived. Mullins had an argument with Amy on Friday evening, July 20, 2007. Amy's daughter reported her missing on Saturday. Amy's body was found on Monday inside an abandoned refrigerator in a gravel pit not far from Mullins' property. She had been beaten and manually strangled.
¶ 3 While searchers were looking for Amy, Thurston County detectives were looking for Mullins. With the help of the local police, they located him in Centralia early on Monday morning. Lead detective Steve Hamilton met Mullins at the Centralia Police Department, advised him of his Miranda rights, and told him he was not under arrest and was free to leave at any time. Mullins agreed to answer questions. After about 45 minutes of questioning, Mullins invoked his rights and said he wanted a lawyer. The detectives terminated the interview and allowed Mullins to leave.
¶ 4 On Monday afternoon, while driving to Aberdeen with a friend, Mullins learned of the discovery of Amy's body. Aware that he was a suspect, he decided to turn himself in. He presented himself at the Grays Harbor County jail in Montesano at approximately 3:40 p.m. An officer from Thurston County arrived, took Mullins into custody, read him his rights, and drove him to the Thurston County jail.
¶ 5 At the Thurston County jail, Mullins made incriminating statements amounting to a confession. He was convicted of first degree murder. He appeals.

ACCESS TO AN ATTORNEY
¶ 6 After he arrived at the Thurston County jail, Mullins was turned over to Thurston County detectives Eugene DuPrey and Jeff Dehan at about 5:30 p.m. They were assigned to execute a search warrant that authorized taking photographs of Mullins as well as removing trace evidence such as hair, fingernail clippings, and saliva samples. They would be assisted in this process by the deputy coroner. Initially, DuPrey and Dehan escorted Mullins into a room nicknamed the "BAC" room because it was the room used for breathalyzer tests of blood alcohol content. DuPrey advised Mullins of his rights. According to unchallenged findings entered after the suppression hearing, Mullins "said something to the effect that he *459 would talk to the detectives after he was appointed an attorney."
¶ 7 The detectives explained to Mullins how they were going to go about collecting evidence. As photographs of Mullins were taken, he was asked if he knew why he was "here" and he responded, "Because my wife's dead." The deputy coroner arrived and continued with evidence collection in a nearby holding cell. When this process was completed, DuPrey returned to the BAC room to complete the prebooking form while Mullins was allowed to wait in a "waiting area" where he had access to telephones.
¶ 8 One of the questions on the prebooking form was whether orders of protection were required for relatives. DuPrey asked Dehan whether Mullins had children who would need such orders. Mullins overheard this question. He walked into the BAC room and approached DuPrey. He asked about his children and then "transitioned into talking about his own childhood. He talked about being locked in a refrigerator by his brother." He then began "talking about a dream that was troubling him."
¶ 9 The detectives interrupted Mullins and reminded him that he had invoked his rights and could simply wait in the adjoining room rather than talking to them. Mullins said, "I know I requested an attorney but I want to talk about the dream I had." The detectives repeated their admonitions. Mullins said he "understood his rights" but had something he wanted to get "off his chest." For the next 20 minutes, while the detectives listened, he narrated a dream which he described as "almost like he was outside his body," giving a version of Amy's violent death that matched details of the murder and crime scene. The detectives asked him if he wished to make a recorded statement repeating what he had just said. Mullins declined.
¶ 10 The detectives completed the prebooking form and turned Mullins over to jail officers, who booked him. This was about one and three quarter hours after Mullins arrived at the jail. At no time did the detectives attempt to place Mullins in communication with a lawyer. The record reflects that a lawyer visited Mullins in the jail about 9 a.m. the next day.
¶ 11 Mullins moved to suppress the detectives' testimony about the statements he made in the booking area of the Thurston County jail. His motion was denied. At trial, their testimony was vital to the State's case. Mullins testified and denied making the statements. He suggested that the detectives made up the "dream" narrative to frame him.
¶ 12 Mullins moved for suppression on two separate grounds. The first was that the detectives improperly questioned him after he had invoked his right to counsel. Under Miranda principles, once a suspect has asserted his right to counsel, custodial interrogation must ceaseunless the suspect initiates further communication. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); State v. Birnel, 89 Wash.App. 459, 468, 949 P.2d 433 (1998), review denied, 138 Wash.2d 1008, 989 P.2d 1141 (1999). The trial court found that Mullins understood his Miranda rights, that the detectives did not interrogate him or engage in conduct designed to elicit an incriminating response, and that it was Mullins who initiated the communication in which he made the incriminating statements. Accordingly, the court concluded the statements were voluntary:
3. The defendant also invoked his rights when he made the response to the effect "I will talk to you after I have an attorney appointed." No interrogation occurred thereafter, as was appropriate. Interrogation must stop (as it did here) unless the defendant himself initiates further communications or exchanges or conversations with the police. This is what the defendant did, in spite of being reminded (by Duprey) that he had previously invoked. By insisting that he "get something off his chest" the defendant initiated the communication, and his ensuing statements were voluntarily made.
Clerk's Papers at 9 (Conclusions as to Admissibility, No. 3).
¶ 13 The second ground for the motion to suppress, and the only ground argued by Mullins on appeal, was that the detectives violated Mullins' right to counsel under CrR *460 3.1. In Washington, the right to a lawyer as provided by court rule accrues "as soon as feasible after the defendant is taken into custody, appears before a committing magistrate, or is formally charged, whichever occurs earliest." CrR 3.1(b)(1). "When a person is taken into custody that person shall immediately be advised of the right to a lawyer." CrR 3.1(c)(1). If the person in custody desires a lawyer, he is to be promptly offered the means of getting in touch with a lawyer:
At the earliest opportunity a person in custody who desires a lawyer shall be provided access to a telephone, the telephone number of the public defender or official responsible for assigning a lawyer, and any other means necessary to place the person in communication with a lawyer.
CrR 3.1(c)(2). The court concluded that Mullins waived his rights under CrR 3.1 when he insisted on getting the story of Amy's death "off his chest" before the detectives completed their prebooking paperwork:
4. The purposes of CrR 3.1 are different from the reasons for Miranda warnings. Miranda's purpose is designed to prevent the State from using presumptively coerced and involuntary statements against criminal defendants. The Court Rule (CrR 3.1) is designed to give a defendant a meaningful opportunity to contact an attorney.
5. Here, Detectives Duprey and Dehan were engaged in executing a warrant and the pre-booking process. Moreover, the court utilizes a Miranda type analysis to determine whether a defendant waives his rights under CrR 3.1.
6. In this instance, the defendant did waive his CrR 3.1 rights. The detectives were executing a court order and otherwise engaged in the booking process. Defendant was in the waiting area and, upon overhearing Duprey's question to Dehan, the defendant initiated the contact with the detectives. He insisted on engaging the detectives to "get something off his chest." His statements were voluntary and his conduct constituted a waiver of his rights under CrR 3.1.
Clerk's Papers at 9-10 (Conclusions as to Admissibility, Nos. 4-6).
¶ 14 Mullins agrees a suspect may waive his rights under CrR 3.1 by voluntarily initiating communication with the police. But he contends that his rights under CrR 3.1 had already been violated when he made his lengthy statement describing Amy's death. At the suppression hearing, Mullins established that Thurston County has a roster of assigned defense counsel who are on call 24 hours a day and the detectives were aware of this. He contends that as soon as he invoked his right to counsel, the rule obligated the detectives to advise him on how to contact the on-call defender.
¶ 15 In determining that the detectives did not have to interrupt their prebooking procedures to offer Mullins help with contacting an attorney, the trial court relied on State v. Wade, 44 Wash.App. 154, 721 P.2d 977, review denied, 107 Wash.2d 1003, 1986 WL 420836 (1986). In Wade, police identified the defendant as a suspect shortly after a robbery. They arrested him and advised him of his Miranda rights. The defendant declined to talk and requested an attorney. He was taken to the police station. There, an officer asked him if he would consent to a search of his car. The defendant said no and stated he should probably talk to an attorney. While he was waiting in the booking area, he made a confession that led to his conviction:
Officer Jensen, who knew Mr. Wade, went to the booking area where Mr. Wade was being processed. Officer Jensen told Mr. Wade where to find him if he wanted to talk. Later Officer Jensen was asked to take Mr. Wade's photo. Officer Jensen testified at that time Mr. Wade said to him: "When you get time come up and see me. Referring to up in the jail. And I said well, I've got a few minutes now if you want to talk we can talk now. And Willie said okay." Officer Jensen then read Mr. Wade his rights. Mr. Wade signed a waiver form and then admitted the armed robbery of Pump and Pak. He also consented to a search of his vehicle. Mr. Wade refused to make a statement on tape and at that point was given a list of public defenders. At trial he denied his involvement in *461 the robbery and the contents of the statement he made to Officer Jensen.
Wade, 44 Wash.App. at 157, 721 P.2d 977.
¶ 16 Wade argued that his request for an attorney was not scrupulously honored pursuant to CrR 3.1(c)(2), and consequently his statement to Officer Jensen should not have been admitted. The court disagreed, first concluding that Wade waived his Miranda rights when he initiated conversation with Officer Jensen. The court then addressed Wade's argument that the police were obliged to put him in contact with an attorney immediately upon his invocation of the right to counsel. The court concluded that although the rule states a person in custody must be given the opportunity to call a lawyer at "the earliest opportunity," police may complete the process of booking a suspect into jail before they provide access to a telephone and the number for a public defender:
The robbery occurred between 5:45 and 5:50 p.m. on December 3, 1984. Less than 10 minutes later, at 5:57 p.m., Mr. Wade was first read his rights and then transported to the police station. At the station, he again requested an attorney. As the booking process was being completed, Mr. Wade initiated the conversation with Officer Jensen. At 6:45 p.m., less than an hour after he was initially stopped as a suspect, he was again advised of his rights and signed a waiver. In our view, Mr. Wade waived his right to counsel before the police had an opportunity to provide him with access to the phone and a list of attorneys who could possibly defend him. Thus, we find no error.
Wade, 44 Wash.App. at 159, 721 P.2d 977.
¶ 17 Ignoring Wade, Mullins relies on State v. Kirkpatrick, 89 Wash.App. 407, 413-14, 948 P.2d 882 (1997), review denied, 135 Wash.2d 1012, 960 P.2d 938 (1998). Deputies from Lewis County arrested Kirkpatrick, a murder suspect, in Port Angeles. After being advised of his Miranda rights, Kirkpatrick agreed to talk. During 90 minutes of questioning, he first denied involvement in the crime and then admitted being in the parking lot when the store clerk was killed inside. "After giving this statement, Kirkpatrick asked if he could leave. Detective Hamilton told him he could not. Kirkpatrick then demanded a lawyer. Detective Hamilton stopped questioning Kirkpatrick, but made no effort to contact a lawyer for Kirkpatrick." Kirkpatrick, 89 Wash.App. at 409, 948 P.2d 882. Without giving Kirkpatrick the opportunity to telephone an attorney, the deputies drove him to Lewis County. During the four hour drive, Kirkpatrick initiated conversation with them, described the crime, and confessed to being the shooter. His statements were admitted at trial, and he was convicted of first degree murder.
¶ 18 On appeal, Kirkpatrick argued his counsel was ineffective for not raising a CrR 3.1 violation at his suppression hearing. The court agreed, distinguishing Wade and holding that the "earliest opportunity" to provide access to a lawyer was immediately after Kirkpatrick requested one:
Here, the police first contacted Kirkpatrick more than three hours before he confessed, and Kirkpatrick first asked for an attorney several hours before confessing. Moreover, Kirkpatrick's request came during normal working hours and at a police station, where presumably procedures exist for contacting defense counsel. Thus, the record demonstrates that the "earliest opportunity" to put Kirkpatrick in touch with an attorney was immediately after his request. As recognized in Wade, a valid waiver must have occurred before this "earliest opportunity." See Wade, 44 Wash.App. at 159 [721 P.2d 977] (suggesting that waiver would not have been valid if the police had opportunity to provide access to telephone and did not do so). To hold otherwise would allow the State to benefit by its own failure to perform its duty under CrR 3.1(c)(2). In short, unlike in Wade, the State has not shown reasonable efforts to contact an attorney, why such efforts could not have been made, or a valid waiver by Kirkpatrick before the "earliest opportunity" arose.
Kirkpatrick, 89 Wash.App. at 415-16, 948 P.2d 882. Nevertheless, the court affirmed the conviction, concluding that even if the defendant had been put in touch with an attorney and had followed advice to remain silent, evidence of his guilt apart from his *462 confession was so strong that there was no reasonable probability of a different verdict at trial.
¶ 19 Mullins also cites State v. Jaquez, 105 Wash.App. 699, 20 P.3d 1035 (2001). Jaquez was convicted of robbery. He demanded an attorney when arrested, and argued on appeal that the police did not respond quickly enough to his request. Following Kirkpatrick, the court found a violation of CrR 3.1 because "the officers did not act at the earliest opportunity to allow Jaquez to contact an attorney. Rather, it appears that they made Jaquez wait at least 45 minutes while other officers drove [the robbery victim] to Jaquez's location for an attempted showup identification." Jaquez, 105 Wash.App. at 715-16, 20 P.3d 1035 (footnote omitted). The court found the error harmless, however, because Jaquez did not show how the outcome would have differed had he been able to contact counsel in advance of the showup. Jaquez, 105 Wash.App. at 717, 20 P.3d 1035. The conviction was reversed on other grounds.
¶ 20 While Kirkpatrick and Jaquez may appear to be at variance with Wade as to when the "earliest opportunity" arises for police to put a person in custody in touch with a lawyer, Kirkpatrick distinguishes Wade rather than disagreeing with it. As the trial court perceived, the cases can be reconciled on the basis that the rule does not necessarily compel police to postpone routine prebooking procedures or the execution of a search warrant when an arrestee expresses the desire to consult an attorney. In Kirkpatrick, the police were in the midst of interrogation when the defendant demanded an attorney. They stopped questioning him, but instead of giving him the opportunity or means to contact an attorney, they took him on a four hour drive to Lewis County. In Wade, on the other hand, when the defendant asked for an attorney, the police were in the midst of completing routine booking, much like the procedures Mullins was undergoing when he invoked his right to counsel. As the trial court found here, Mullinsunlike the defendant in Kirkpatrickwas not "restrained in close custody." Rather, while the detectives filled out forms, Mullins was permitted to remain in a waiting area where he had access to telephones.
¶ 21 We do not mean to suggest that "the earliest opportunity" for police to facilitate a telephone call is always after prebooking procedures; this would not be true, for example, in the circumstances of an arrest for driving while intoxicated. See State v. Fitzsimmons, 93 Wash.2d 436, 610 P.2d 893, vacated and remanded, 449 U.S. 977, 101 S.Ct. 390, 66 L.Ed.2d 240, aff'd on remand, 94 Wash.2d 858, 620 P.2d 999 (1980), overruled on other grounds by City of Spokane v. Kruger, 116 Wash.2d 135, 803 P.2d 305 (1991). And there may be other situations in which the booking process should be interrupted, for example, if it is unduly protracted. We merely conclude that under these circumstances, Wade is the applicable precedent. Despite the reminders from the detectives that he had requested an attorney and could wait quietly in the adjoining room, Mullins began to talk and thus waived his rights under CrR 3.1.

LESSER INCLUDED OFFENSE INSTRUCTION
¶ 22 The jury was instructed on the charge of first degree murder without the option of convicting on the lesser included offense of second degree murder. Mullins contends counsel was ineffective for failing to request an instruction on the lesser included offense.
¶ 23 In order to prevail on an ineffective assistance claim, the defendant must demonstrate "(1) deficient performance, that his attorney's representation fell below the standard of reasonableness, and (2) resulting prejudice that, but for the deficient performance, the result would have been different." State v. Hassan, 151 Wash.App. 209, 216-17, 211 P.3d 441 (2009).
¶ 24 A defendant is entitled to a lesser included offense instruction "if each of the elements of the lesser offense is a necessary element of the greater offense (the legal prong), and the evidence supports an inference that only the lesser offense was committed (the factual prong)." State v. Pittman, 134 Wash.App. 376, 384, 166 P.3d 720 (2006). Legally, second degree murder is a lesser included offense encompassed within the *463 charge of first degree murder. What distinguishes first degree murder is the additional element of premeditation. State v. Bingham, 105 Wash.2d 820, 823, 719 P.2d 109 (1986).
¶ 25 Here, there was scant evidence that Amy's murder was anything but premeditated. But even assuming that the instruction was supported by the evidence and would have been given if requested, we cannot conclude defense counsel's failure to request it was below the standard of reasonableness. "The decision to not request an instruction on a lesser included offense is not ineffective assistance of counsel if it can be characterized as part of a legitimate trial strategy to obtain an acquittal." Hassan, 151 Wash.App. at 218, 211 P.3d 441.
¶ 26 Plainly, Mullins made a conscious choice to pursue acquittal outright rather than conviction on the lesser offense. The trial court asked defense counsel on two occasions whether the defense would be submitting lesser-included instructions. Both times, counsel said that he had discussed the options with Mullins and the answer was no.
¶ 27 The same scenario occurred in State v. Hoffman, 116 Wash.2d 51, 804 P.2d 577 (1991). The court determined that the defense pursued a "calculated defense trial strategy" and that "having decided to follow one course at the trial, they cannot on appeal now change their course and complain that their gamble did not pay off." Hoffman, 116 Wash.2d at 112, 804 P.2d 577. Although the appellants in Hoffman were alleging trial error rather than ineffective assistance of counsel, the principle is the same. We cited Hoffman as part of our rationale for rejecting the claim of ineffective assistance in Hassan. There, too, the defense considered, but rejected, the opportunity to seek a lesser included offense instruction.
¶ 28 Mullins contends we should follow a line of cases holding that ineffective assistance will be found where a fact intensive inquiry discloses that an "acquittal only" strategy was objectively unreasonable. See State v. Grier, 150 Wash.App. 619, 208 P.3d 1221 (2009), review granted, 167 Wash.2d 1017, 224 P.3d 773 (2010); State v. Pittman, 134 Wash.App. 376, 166 P.3d 720; State v. Ward, 125 Wash.App. 243, 104 P.3d 670 (2004). But in these cases, the record does not disclose a conscious choice by the defense to pursue acquittal only. And as we noted in Hassan, these cases "do not properly take into consideration the strong presumption of effective assistance in determining whether the decision to seek acquittal was a legitimate trial strategy." Hassan, 151 Wash. App. at 221 n. 6, 211 P.3d 441.
¶ 29 In any event, it was not objectively unreasonable for Mullins to pursue a strategy of acquittal only. The evidence proving that a first degree murder occurred was very strong. The State was able to use Mullins' custodial statements about his "dream" to prove that he was the perpetrator of the murder. Mullins denied making those statements and testified that he was innocent of the murder. As we said in Hassan:
Where a lesser included offense instruction would weaken the defendant's claim of innocence, the failure to request a lesser included offense instruction is a reasonable strategy. Strickland [v. Washington], 466 U.S. [668] at 691, 104 S.Ct. 2052 [80 L.Ed.2d 674 (1984) ].
Hassan, 151 Wash.App. at 220, 211 P.3d 441. If Mullins had tried to argue that he was guilty at most of second degree murder, it would have weakened his claim of innocence. We conclude Mullins has not carried his burden of establishing deficient performance by counsel.

ADDITIONAL GROUNDS
¶ 30 Mullins filed a statement of additional grounds as permitted by RAP 10.10. He first contends the trial court erred by denying his motion for a mistrial. Mullins moved for a mistrial on November 4, 2008, based on concerns about buttons and signs displayed by friends of Amy, and other matters outside the evidence. The trial judge, who was in a position to judge the impact of these events on the trial, decided they had not caused prejudice. Our review of the record gives us no basis to disagree.
¶ 31 Mullins makes allegations of perjury based on inconsistencies in the testimony of the witnesses. Inconsistencies in the testimony are not grounds for reversal *464 because witness credibility is a determination for the jury. Stiley v. Block, 130 Wash.2d 486, 925 P.2d 194 (1996).
¶ 32 Mullins contends the police illegally searched his property and person as well as Amy's house. There was no motion to suppress evidence as fruit of an illegal search. We reject this argument as waived. State v. Baxter, 68 Wash.2d 416, 423-24, 413 P.2d 638 (1966).
¶ 33 Mullins claims that the State destroyed exculpatory evidence by not testing the scratches on Amy's neck for DNA (deoxyribonucleic acid). "Unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988). The evidence may have been potentially useful, but Mullins identifies no basis for determining the police acted in bad faith.
¶ 34 Affirmed.
WE CONCUR: SPEARMAN and SCHINDLER, JJ.