# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | | |
|---|---|---|---|
| STATE OF WASHINGTON, | ) | No. 68319-5-I | |
| | ) | | |
| Respondent, | ) | DIVISION ONE | |
| | ) | | |
| v. | ) | UNPUBLISHED OPINION | |
| | ) | | |
| JAIME JOVANY CRUZ-PELAYO, | ) | | |
| | ) | FILED: June 17, 2013 | |
| Appellant. | ) | | |

GROSSE, J. — Child hearsay is admissible under RCW 9A.44.120(1) if sufficient indicia of reliability are present. And, a juvenile's confession is admissible if, under the totality of the circumstances, the confession was voluntary. Here, the trial court did not abuse its discretion in finding that the child hearsay was reliable and therefore admissible and that the juvenile respondent's confession was voluntary and therefore admissible. Accordingly, we affirm.

Jaime Cruz-Pelayo (born May 19, 1996) was found guilty of two counts of first degree child molestation. The incidents occurred between January 1, 2010 and October 31, 2010. Cruz-Pelayo assigns error to the trial court's admission of out-of-court statements the victim, K.R.F. (born February 23, 2002), made to her mother and Cruz-Pelayo's statements to the investigating officers.

## I. Admission of Child Hearsay

In February 2011, K.R.F., alone with her mother in the kitchen, asked her mother if she could talk to her about something. K.R.F. told her mother that Cruz-Pelayo had touched her "inside of my clothes, inside of my underpants, and he put his fingers inside of me." K.R.F. told her mother that Cruz-Pelayo touched her in her "private part," which, according to the mother, meant her vagina.

K.R.F. made similar statements to her stepfather when he entered the kitchen while she and her mother were talking. K.R.F. also told an examining physician, Dr. Yolanda Duralde, that Cruz-Pelayo touched her on more than one occasion, both on top of and underneath her clothes, and told her not to tell anybody. And, she made similar statements to Carolyn Webster, a child interview specialist from the prosecutor's office. The trial court ruled that K.R.F.'s statements to her mother, Dr. Duralde, and Webster were admissible. On appeal, Cruz-Pelayo challenges the admissibility of only K.R.F.'s statements to her mother.

This court reviews a trial court's decision to admit child hearsay for abuse of discretion.[1] An out-of-court statement by a testifying child victim is admissible under RCW 9A.44.120(1) if the court finds "that the time, content, and circumstances of the statement provide sufficient indicia of reliability."[2] In determining the reliability of child hearsay, a court considers nine nonexclusive factors: (1) whether the declarant had an apparent motive to lie, (2) the declarant's general character, (3) whether more than one person heard the statement, (4) the spontaneity of the statement, (5) the timing of the declaration and the relationship between the declarant and the witness, (6) whether the

---

[1] State v. Kennealy, 151 Wn. App. 861, 879, 214 P.3d 200 (2009).
[2] RCW 9A.44.120(1) provides:

> A statement made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another, describing any attempted act of sexual contact with or on the child by another, or describing any act of physical abuse of the child by another that results in substantial bodily harm as defined by RCW 9A.04.110, not otherwise admissible by statute or court rule, is admissible in evidence in dependency proceedings under Title 13 RCW and criminal proceedings, including juvenile offense adjudications, in the courts of the state of Washington if:
> (1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability[.]

2

statement contains express assertions of past fact, (7) whether the declarant's lack of knowledge could be established by cross-examination, (8) the possibility of the declarant's recollection being faulty is remote, and (9) whether the circumstances suggest the declarant misrepresented the defendant's involvement.[3] The court considers these factors as a whole; no single factor is decisive.[4]

Here, the trial court found that factors 1, 2, 3, 4, 5, 8, and 9 weighed in favor of the admissibility of K.R.F.'s out-of-court statements and that factors 6 and 7 were not relevant. On appeal, Cruz-Pelayo agrees that factors 6 and 7 are not relevant and that factors 1 and 2 weigh in favor of admissibility. He also states that factor 9 is covered by factors 3 and 5. He argues that the remaining factors weigh against the admissibility of K.R.F.'s statements and that the statements were not admissible.

Whether More than One Person Heard the Statement

This factor is satisfied where the child repeated similar statements to different people on different occasions.[5] Here, K.R.F. made similar statements on different occasions to her mother, her stepfather, Dr. Duralde, and Webster.

Spontaneity of the Statements

Cruz-Pelayo concedes that K.R.F.'s initial statements to her mother were spontaneous, but argues that her subsequent statements to her mother were not spontaneous because they were made in response to the mother's closed-ended questions. Cruz-Pelayo argues that, at best, this factor is neutral.

---

[3] State v. Ryan, 103 Wn.2d 165, 175-76, 691 P.2d 197 (1984).
[4] State v. Swan, 114 Wn.2d 613, 652, 790 P.2d 610 (1990).
[5] State v. Lopez, 95 Wn. App. 842, 853, 980 P.2d 224 (1999) (statements to the mother, the police, and a forensic interviewer of sexually abused children).

A child's statement is spontaneous when made in response to a question that is neither leading nor suggestive.[6] Here, as the State points out, K.R.F.'s mother's questions, if suggestive, were intended to elicit responses that minimized the abuse, and K.R.F. did not respond to any suggestiveness inherent in her mother's questions. Rather, K.R.F.'s responses to her mother's questions made the abuse more egregious than the questions suggested. For example, K.R.F's mother asked whether somebody "tr[ied]" to touch her, rather than whether somebody actually did touch her. K.R.F. replied that no, Cruz-Pelayo actually did touch her. Also, when K.R.F. told her mother that Cruz-Pelayo touched her, the mother asked her, "But it was only over the clothes?" K.R.F. replied that no, Cruz-Pelayo touched her under her clothes as well.

### Timing of the Statement and the Relationship Between the Declarant and the Witness

K.R.F.'s family stopped going to Cruz-Pelayo's family's house in October 2011. K.R.F.'s statements to her mother occurred in February 2011. Cruz-Pelayo argues that this time period favors a finding of unreliability. But, Cruz-Pelayo fails to cite any authority or make any meaningful argument to support this assertion. Nor does he explain his contention that the trial court "took a very narrow and unreasonable view" of this factor. We agree with the trial court that there is nothing about the time of the statements that renders them unreliable.

Cruz-Pelayo argues that the fact that K.R.F.'s statements were made to her mother shows unreliability. But, "[w]hen the witness is in a position of trust with a child,

---

[6] State v. Henderson, 48 Wn. App. 543, 550, 740 P.2d 329 (1987).

this factor is likely to enhance the reliability of the child's statement."[7] The record shows that K.R.F. had a strong relationship with her mother. The fact that she made the statements to her mother supports the trial court's finding of reliability.

Possibility of Faulty Recollection

Cruz-Pelayo argues that this factor weighs heavily against reliability because some of K.R.F.'s statements to her mother were inconsistent with her later testimony. While some of the details of K.R.F.'s statements were inconsistent, her statements that Cruz-Pelayo touched her on top of and underneath her clothes remained consistent. And, importantly, her statements to Dr. Duralde and Webster were consistent with those to her mother. Consistent statements to others supports the conclusion that the witness's recollection is not faulty.[8] Further, "'[a] young child is unlikely to fabricate a graphic account of sexual activity because such activity is beyond the realm of [a child's] experience.'"[9]

In sum, we find that the trial court did not abuse its discretion in finding that K.R.F.'s statements to her mother were reliable and therefore admissible.

II.    Admission of Cruz-Pelayo's Statements

Child Protective Services referred the case to the Monroe Police Department. Officer Max Michel, the Monroe High School resource officer, and Monroe Police Department Detective Spencer Robinson investigated the matter. Detective Robinson

---

[7] Kennealy, 151 Wn. App. at 884 (holding that the fact that the children made the statements to their family members, with whom they were in a relationship of trust, and to police officers and nurses, whom they trusted because of their authoritative position in the community, supported the trial court's finding of reliability of the statements).
[8] Swan, 114 Wn.2d at 652.
[9] Kennealy, 151 Wn. App. at 884 (alterations in original) (quoting State v. Frey, 43 Wn. App. 605, 610, 718 P.2d 846 (1986)).

5

asked Officer Michel to contact Cruz-Pelayo for an interview in regards to a crime the detective was investigating. Officer Michel, armed and in uniform, took Cruz-Pelayo to his office in the school where Detective Robinson, in plain clothes but also armed, was waiting.

Detective Robinson read Cruz-Pelayo his rights under Miranda v. Arizona[10] from a department-issued card, and Cruz-Pelayo waived his rights. Cruz-Pelayo did not indicate that he did not understand any of his rights, nor did he indicate that he was afraid or intimidated. No threats, promises, or other means of coercion were used to get Cruz-Pelayo to talk.

Detective Robinson asked Cruz-Pelayo about K.R.F.'s allegations. Initially, Cruz-Pelayo said that K.R.F. must have mistaken him for his brother and later said that he and K.R.F. were playing roughly and he grabbed her leg and threw her on the bed. He explained that the roughhousing could have been why K.R.F. made the allegations. Because Cruz-Pelayo's statements differed so dramatically from K.R.F.'s allegations, Detective Robinson asked Cruz-Pelayo if he would be willing to take a polygraph test. It does not appear that Cruz-Pelayo answered the detective's question about the polygraph, but rather talked again about the roughhousing. At that point, Detective Robinson took a break with Officer Michel to discuss Cruz-Pelayo's responses to the questioning.

Upon returning to the room, Detective Robinson told Cruz-Pelayo that he did not feel he was being fully truthful with them. Cruz-Pelayo then told the officers that K.R.F. went under the bed, called for Cruz-Pelayo to join her, and, when he was under the bed

---

[10] 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

with her, grabbed his hand, pulled it to her vagina, and forced him to rub her. He said he stopped after about five seconds because he realized that what he was doing was wrong. Cruz-Pelayo said he lied about the incident because he did not want to get into trouble for it.

Detective Robinson asked Cruz-Pelayo if he was willing to write a statement. Cruz-Pelayo said he would, but because he was shaken up from his disclosures, he asked Detective Robinson to write a statement for him. According to Officer Michel, a person's being too shaken up to write a statement is not uncommon. Before writing Cruz-Pelayo's statement, Detective Robinson went over the constitutional rights form line by line. Cruz-Pelayo signed the form. Detective Robinson wrote the statement and went over it with Cruz-Pelayo. Cruz-Pelayo signed the statement and adopted it as his own.

Cruz-Pelayo testified that he was confused, scared, and nervous during the interview. He said he changed his story during the interview because he wanted to get out of the room. He claimed he "invented a story to get out of there" and that none of the story about K.R.F. forcing him to touch her was true. Cruz-Pelayo testified that he might have read the statement Detective Robinson wrote, but then forgot its contents because he was not paying attention. He also testified that he understood he had the right to remain silent, but did not pay attention to that either.

Cruz-Pelayo moved to suppress his statements to Detective Robinson and Officer Michel. The trial court determined that the statements were made knowingly, willfully, and voluntarily after a knowing, voluntary, and intelligent waiver of his Miranda rights. Accordingly, the court found the statements admissible.

On appeal, Cruz-Pelayo argues that his statements were not voluntary and that he did not voluntarily waive his rights prior to acknowledging the written statement. In reviewing the denial of a motion to suppress, we determine whether substantial evidence supports the trial court's findings of fact and whether those findings support the conclusions of law.[11] We review conclusions of law de novo.[12]

A defendant waives his or her Miranda rights if the waiver is knowing, voluntary, and intelligent.[13] It is the State's burden to prove voluntariness by a preponderance of the evidence.[14] In determining whether a juvenile's confession was voluntary, we consider the totality of the circumstances.[15]

The test for voluntariness is whether the defendant made the free and unconstrained choice to confess.[16] Factors a court considers in assessing the totality of the circumstances include the defendant's physical condition, age, mental abilities, experience, and conduct of the police.[17] "State courts have a responsibility to examine confessions of a juvenile with special care."[18]

Here, considering the totality of the circumstances, substantial evidence supports the trial court's finding that Cruz-Pelayo was fully aware of and understood his Miranda rights and knowingly, voluntarily, and intelligently waived them. The officers' testimony shows that they did not use force, threats, coercion, or intimidation to elicit Cruz-

---

[11] State v. Ross, 106 Wn. App. 876, 880, 26 P.3d 298 (2001).
[12] State v. Acrey, 148 Wn.2d 738, 745, 64 P.3d 594 (2003).
[13] Miranda, 384 U.S. at 444; State v. Bradford, 95 Wn. App. 935, 944, 978 P.2d 534 (1999).
[14] State v. Braun, 82 Wn.2d 157, 162, 509 P.2d 742 (1973).
[15] State v. Unga, 165 Wn.2d 95, 103, 196 P.3d 645 (2008).
[16] State v. Thompson, 73 Wn. App. 122, 131, 867 P.2d 691 (1994) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)).
[17] State v. Aten, 130 Wn.2d 640, 663-64, 927 P.2d 210 (1996).
[18] Unga, 165 Wn.2d at 103.

Pelayo's oral or written statements. The testimony also shows that Cruz-Pelayo understood his <u>Miranda</u> rights, including the right to remain silent, and voluntarily chose to make his statements. The trial court's finding of voluntariness is supported by substantial evidence, and this finding supports the court's conclusion that Cruz-Pelayo's statements were admissible.

Affirmed.

WE CONCUR: